Appeal No. 2015-1281
(Serial No. 95/001,910)

# United States Court of Appeals

*for the*

# Federal Circuit

WATERS TECHNOLOGIES CORPORATION,

*Appellant,*

– v. –

AURORA SFC SYSTEMS, INC.,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD

## BRIEF ON BEHALF OF APPELLANT

ERIK PAUL BELT
DEBORAH M. VERNON
KIA LYNN FREEMAN
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6500

*Attorneys for Appellant*

ORIGINALLY FILED: APRIL 6, 2015
CORRECTED: APRIL 8, 2015

# CERTIFICATE OF INTEREST

Counsel for appellants certifies the following:

**1.   The full name of every party or amicus represented by me is:**

Waters Technologies Corporation

**2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A

**3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Waters Corporation

**4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

McCarter & English, LLP

Erik Paul Belt, Partner; Deborah M. Vernon, Partner; Kia Lynn Freeman, Partner; and Danielle L. Herritt, Partner.

/s/ Erik Paul Belt
**ERIK PAUL BELT**

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .......................................................................i

TABLE OF CONTENTS......................................................................... ii

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF RELATED CASES ..................................................vi

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW ....................................................1

KEY TO ABBREVIATIONS USED IN THIS BRIEF.............................2

STATEMENT OF THE CASE...................................................................2

I.      THE PRIMARY ISSUE ON APPEAL ..........................................2

II.     THE PROBLEM SOLVED BY THE '767 PATENT....................7

        A.      The Field of Art: Chromatography .....................................7

        B.      The Problem with SFC: Changes in Compressibility ..........8

        C.      What Causes Changes in Compressibility and Why Are Such
                Changes So Problematic in SFC? .........................................9

        D.      The Prior Art Methods of Compensating for Changes in Z...............13

        E.      Compressibility Compensation:  CCC *vs*. DCC ................14

        F.      The Innovation of the '767 Patent:  Limit Z so that CCC Alone,
                without DCC, Can Do the Job.............................................18

        G.      The Claimed Methods:  Control Pressure, then Pump at a CCC ........21

III.   THE PRIOR ART FAILS TO DISCLOSE PUMPING AT CCC
       WHILE AVOIDING DCC ................................................................24

IV.    THE UNDERLYING *INTER PARTES* REEXAMINATION ......................25

       A.    Procedural History.................................................................25

       B.    The Board's Claim Construction Error ................................26

SUMMARY OF ARGUMENT ..............................................................30

ARGUMENT ......................................................................................33

I.     STANDARD OF REVIEW ........................................................33

II.    THE BOARD ERRED BY READING A LIMITATION OUT OF THE
       CLAIMS ..............................................................................34

       A.    The Patent Specification Teaches that the Pump Must Have a
             Capacity for CCC and Use it ...............................................36

       B.    Pumping . . . at a CCC Does Not Mean Pumping at *No* CCC ............39

       C.    The Claim Wording Requires "Pumping . . . at a CCC"....................40

III.   THE CLAIMS ARE NOVEL AND NON-OBVIOUS OVER THE
       CITED PRIOR ART..................................................................43

CONCLUSION ...................................................................................45

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

*Astrazeneca AB v. Mut. Pharm. Co.*,
  384 F.3d 1333 (Fed. Cir. 2004) ...................................................43

*Becton Dickinson and Co. v. Tyco Healthcare Group, LP*,
  616 F.3d 1249 (Fed. Cir. 2010) .................................................41

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
  418 F.3d 1225 (Fed. Cir. 2005) .................................................35

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  329 F.3d 1358 (Fed. Cir. 2003) .................................................41

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) .................................................37

*In re Buzzard*,
  504 F.3d 1364 (Fed. Cir. 2007) .................................................35

*In re Cuozzo Speed Techs., LLC*,
  778 F.3d 1271 (Fed. Cir. 2015) .................................................33

*In re Imes*,
  778 F.3d 1250 (Fed. Cir. 2015) .................................33, 34, 44

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) .................................................34

*In re Stoller*,
  No. 2014-1271, 2015 WL 202186 (Fed. Cir. Jan. 15, 2015) .......................34

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) .................................................34

*K/S HIMPP v. Hear-Wear Techs., LLC*,
  751 F.3d 1362 (Fed. Cir. 2014) .............................................34, 44

*KCJ Corp. v. Kinetic Concepts, Inc.*,
  223 F.3d 1351 (Fed. Cir. 2000) .................................................41

*Key Mfg. Group, Inc. v. Microdot, Inc.*,
  925 F.2d 1444 (Fed. Cir. 1991) .................................................42

*Lewmar Marine, Inc. v. Barient, Inc.*,
　　827 F.2d 744 (Fed. Cir. 1987) .......................................................41

*Pregis Corp. v. Kappos*,
　　700 F.3d 1348 (Fed. Cir. 2012) .......................................................1

*Q.I. Press Controls, B.V. v. Lee*,
　　752 F.3d 1371 (Fed. Cir. 2014) .......................................................1

*Rambus Inc. v. Rea*,
　　731 F.3d 1248 (Fed. Cir. 2013) .....................................................44

*Suffolk Technologies, LLC v. AOL Inc.*,
　　752 F.3d 1358 (Fed. Cir. 2014) .....................................................38

*Synthon Pharms., Inc. v. Sanofi-Aventis U.S. LLC*,
　　Appeal No. 2013-000570, 2013 WL 1310673
　　(P.T.A.B. Mar. 27, 2013).................................................................35

*Tempo Lighting, Inc. v. Tivoli, LLC*,
　　742 F.3d 973 (Fed. Cir. 2014) ...........................................33, 34, 39

*Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.*,
　　135 S. Ct. 831 (2015).....................................................................33

*Yates v. United States*,
　　135 S. Ct. 1074 (2015)............................................................35, 36

## Statutes & Other Authorities

28 U.S.C. § 1295(a)(4)(A) ....................................................................1

35 U.S.C. § 141 .....................................................................................1

35 U.S.C. § 142 .....................................................................................1

35 U.S.C. § 311 .....................................................................................1

## <u>STATEMENT OF RELATED CASES</u>

This appeal is related to Federal Circuit Appeal No. 15-1280, which involves the same patent owner and stems from the same underlying litigation but involves a different patent. The patent in the co-pending appeal is directed to similar technology and shares all of the same inventors but one. Waters Technologies Corporation asserted both patents against Aurora SFC Systems, Inc., in the District of Delaware in 2011. That litigation was stayed pending *inter partes* reexamination of the two patents. Both appeals concern the outcomes of the two reexaminations—one favorable to Waters and one against. Waters is the appellee in No. 15-1280 and the appellant here. This Court stayed No. 15-1280 pending Waters's motion to dismiss. *See* No. 15-1280, Dkt. No. 31, April 1, 2015.

## JURISDICTIONAL STATEMENT

This appeal follows a final decision of the Patent Trial and Appeal Board ("Board") in an *inter partes* reexamination instituted under 35 U.S.C. §§ 311 *et seq.*  As such, this Court has subject matter jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.  The examiner rejected all claims, and the patent owner, Waters Technologies Corporation ("Waters"), appealed to the Board. The Board affirmed rejection of the claims on September 25, 2014.  A1-26. Neither party sought a rehearing.  Waters noticed its appeal within 60 days, as permitted under 35 U.S.C. § 142, on November 21, 2014.[1]

## ISSUE PRESENTED FOR REVIEW

Whether the Board's decision rejecting all claims of the reexamined patent should be reversed because it is based on a claim construction that reads an express limitation out of the claims that, had the limitation remained in the claims, would have distinguished the prior art.

---

[1] Because this appeal follows an *inter partes* reexamination filed before the America Invents Act discontinued such proceedings, the versions of the above-cited provisions that existed before September 16, 2012, continue to apply.  *See Pregis Corp. v. Kappos*, 700 F.3d 1348, 1358 n.1 (Fed. Cir. 2012); *see also Q.I. Press Controls, B.V. v. Lee*, 752 F.3d 1371, 1374 n.1 (Fed. Cir. 2014).

## KEY TO ABBREVIATIONS USED IN THIS BRIEF

| | |
|---|---|
| **CCC** | Constant Compressibility Compensation |
| **DCC** | Dynamic Compressibility Compensation |
| **HPLC** | High Performance Liquid Chromatography |
| **SFC** | Supercritical Fluid Chromatography |
| **Z** | Compressibility factor of a fluid |

## STATEMENT OF THE CASE

### I.     THE PRIMARY ISSUE ON APPEAL

This is the case of the missing claim limitation.  In the underlying *inter partes* reexamination of U.S. Patent No. 6,561,767 ("the '767 patent"), the examiner rejected all claims as anticipated or made obvious by certain prior art. A1119.  The Board affirmed.  A3.  The Board, however, erred when it read out of the claims an express limitation that would have distinguished the prior art.

More specifically, the '767 patent, entitled "Converting a Pump for Use in Supercritical Fluid Chromatography," discloses and claims methods for converting an inexpensive pump having only "constant compressibility compensation" ("CCC") so that it can be used in supercritical fluid chromatography ("SFC") systems without the need for "dynamic compressibility compensation" ("DCC").

*See* A35 at 3:12-42; A36 at 5:1-27.  As explained in Section II below, prior art SFC methods required DCC for optimum performance, but DCC is expensive, complicated, and imperfect.  The '767 patent teaches how to avoid the expense and complexity of DCC while still optimizing performance with only CCC.  A36 at 5:55-65; A400 at ¶¶ 16-17.

The Board framed the decisive issue in this case as one of claim construction and, specifically, whether the claims require pumping at a CCC.  If the claims require pumping at a CCC, then the prior art "syringe" pumps, which lack the capacity for CCC, would not anticipate the claims or render them obvious. To wit:

> The primary issue in this appeal turns on whether the step of "pumping of [a] first flow stream . . . resulting in delivery of a controllable flow rate of said first flow stream at a constant compressibility compensation without the need for dynamically compensating said pump for compressibility changes in said first flow stream" is sufficiently broad to encompass pumping of the first flow stream against an elevated pressure using a syringe pump lacking a compressibility compensation adjustment mechanism.

A11.  Put another way, the question is whether CCC is merely the result of pumping a compressible fluid against an elevated pressure, as the Board concluded (*see* A13-15), or whether the pump itself must actually pump the compressible fluid at a CCC, as the claims require, as Waters argued, and as the patent specification teaches.  In reading CCC out of the claims, the Board divorced the claims from the context of the specification and the relevant technology.

The claims themselves require pumping at "a constant compressibility compensation."  Representative Claim 1 provides as follow:

> 1.  A method for converting a pump for use in a combined flow stream containing a mixture of highly compressed gas, compressible liquid or supercritical fluid; and a relatively incompressible liquid, comprising:
>
> controlling pressure of a first flow stream containing a highly compressed gas, compressible liquid, or supercritical fluid, by maintaining an elevated pressure rate after said outlet of said pump but prior to joining a second flow stream of a relatively incompressible liquid; <u>and</u>
>
> **pumping** of said first flow stream consisting of a pure fluid resulting in delivery of a controllable flow rate of said first flow stream **at a constant compressibility compensation without the need for dynamically compensating said pump for compressibility changes** in said first flow stream.

A1274 (emphasis added).[2]

The Board, however, wrongly considered CCC to be merely the result of the first claimed step ("controlling pressure . . .") rather than a limitation in its own right.  Specifically, the Board held that the claimed methods "may be performed by a pump lacking a compressibility compensation adjustment mechanism."  A16; *see also* A18 ("the usage does not exclude converting a pump having no compressibility compensation adjustment mechanism for use in gradient elution SFC") .  In effect, the Board read "pumping . . . . at *a* CCC" to include pumping at

---

[2]    The Board designated Claim 1 as representative.  A7.  During reexamination, Waters amended the two original independent claims, Claims 1 and 7, by adding the word "and," as indicated above.  Waters then added four new claims, Claims 13-16.  All claims are directed to similar methods for pumping compressible fluids in a combined flow stream while avoiding DCC.  *See* A1274-76.

"*no*" CCC, which is unreasonably broad.    Apparently, the Board ignored the

express teaching of the patent that the pump must have and use CCC:

> In particular, **the invention pertains to converting a pump with a constant compressibility compensation** for use in gradient elution supercritical fluid chromatography (SFC).
>
>  . . . In the present invention, unmodified HPLC pumps can [be made] to deliver reproducible flow conditions of a pure fluid under isocratic conditions to an SFC system, **despite having limited compressibility compensation ranges** and no ability to dynamically compensate for compressibility changes.

A35 at 3:16-31 (emphasis added).

The Board's error allowed it to rely on so-called "syringe" pumps in the

cited prior art to invalidate the claims.    But as Waters's technical expert, Dr.

Chordia, explained, syringe pumps lack the capacity for CCC:

> Syringe pumps do not have a compressibility compensation adjustment mechanism, therefore compression cannot be changed based on a compressibility factor Z, like it can be in reciprocating check valve pumps described in the Issued Patent.    In other words, syringe pumps, as designed, are not capable of providing CCC.

A401 at ¶ 20.

>  . . . Syringe pumps do not have reciprocating check valves nor the software/hardware needed to compress fluid based on a known volume of components and Z. Therefore, syringe pumps are not designed to be capable of providing CCC.

*Id*. at ¶ 22; *see also* A402 at ¶ 27.[3]

---

[3]    Dr. Chordia has a doctoral degree in chemical engineering from Carnegie-Mellon University and has worked in the SFC field for over 30 years.    He is an inventor named on seven patents directed to SFC technology.    A398-99 at ¶¶ 1-8.

Apparently conceding this point, the third-party requester, Aurora SFC Systems, Inc. ("Aurora"), did not challenge Dr. Chordia's testimony nor offer an opposing expert. The Board found that "[t]he Examiner, the Requester and the Patent Owner appear to agree, at least for purposes of this appeal, that a syringe pump has no compressibility compensation adjustment mechanism." A19.

The '767 patent itself disparages syringe pumps while touting reciprocating pumps, which do have CCC capability. A34 at 1:61-63 ("Reciprocating pumps are typically used in HPLC and SFC. These pumps are more accurate than syringe pumps") and 2:5-16 (detailing compression compensation in reciprocating pumps).

Despite the general agreement that syringe pumps are not capable of pumping at a CCC, the Board held that the prior art anticipated the claims or rendered them obvious because, based on the erroneous claim construction, the pump need not actually pump at a CCC. Instead, the Board held that a "syringe pump acting against a constant, elevated back pressure will perform the step of pumping a flow stream substantially identically to a reciprocal pump having a compressibility compensation adjustment mechanism acting against a constant, elevated back pressure." A14. This holding, however, is based on a fundamental misunderstanding of the technology and claimed methods. As will be discussed below, controlling the pressure (*e.g.*, pumping against an elevated back pressure) does not result in "pumping . . . at a CCC" but rather creates the conditions under

which CCC alone, without DCC, can work in an SFC system. The pump must still have the ability to pump at a CCC and, in fact, do so. The Board incorrectly speculated that a syringe pump without a CCC mechanism pumping against an elevated pressure can mimic a reciprocal pump "pumping . . . at a constant compressibility compensation" against an elevated pressure. That holding lacks any legal or evidentiary support.

## II.    THE PROBLEM SOLVED BY THE '767 PATENT

The Board's claim construction error becomes clear when the claims are read in light of the specification, the technology, and the purpose of the invention.

### A.    The Field of Art: Chromatography

By way of introduction, the relevant field of art is chromatography and, more specifically, supercritical fluid chromatography ("SFC"). A34 at 1:7-20; A35 at 3:13-42, 4:34-37; A36 at 5:1-10. Chromatography encompasses various lab techniques and equipment for separating and analyzing chemical components in a sample. The Board looked to U.S. Pat. No. 4,032,445 to Munk ("Munk '445") for an overview of chromatography. A4. Specifically:

> Chromatography is a separation method wherein a mixture of components (called the "sample" or "sample mixture") is placed as a zone at one end of a system containing a stationery [*sic*] phase and a mobile phase. Each component of the sample distributes itself in dynamic equilibrium between the two phases, in a ratio characteristic of that component. As a result, the flowing mobile phase causes each individual component zone to migrate at a characteristic rate, and the zones become separated after a period of time. There are various

types of chromatography, e.g., liquid chromatography, gas chromatography, thin-layer chromatography, etc. The major difference between these various chromatography methods is the physical state of the mobile phase (gas or liquid) and the manner in which the stationary phase is supported (e.g., coated on an inert granular material packed in a tube, coated on an inert plate, etc.). In each method, the separation mechanism is essentially the same, i.e., distribution of the sample components between the mobile phase and a stationary phase. When the method is used for chemical analysis, a detector is often placed at the other end of the system, so as to monitor the passage of the component zones as they emerge from the system. The signal from the detector is displayed on a recording device such as a strip chart recorder, and the record indicates both qualitative and quantitative information regarding the components of the sample.

A334 at 1:10-37.

### B.    The Problem with SFC: Changes in Compressibility

SFC is an advanced form of chromatography that operates at high pressures and uses fluids at or near supercritical conditions. SFC, however, suffers from problems not associated with standard chromatography. As the '767 patent explains, "[p]umping compressible fluids, such as carbon dioxide (CO2), at high pressures in SFC systems while accurately controlling the flow, is more difficult than that for a liquid chromatography system." A34 at 1:10-13. The particular difficulty concerns the compressibility factor ("Z") of the compressible fluid, such as $CO_2$. Changes in Z cause unwanted ripples in the mobile phase of the SFC system. These ripples impair the accuracy of SFC separation and analysis. A34 at 2:17-23 ("Without a correct Z, the pump either under- or over-compresses the fluid causing characteristic ripples in flow and pressure. Either under- or over-

compensation results in periodic variation in both pressure and flow . . . The result is noisy baselines and irreproducibility"); A35 at 3:7-9 ("At high pressures, compressibility of solvents is very noticeable and failure to account for compressibility causes technical errors in analyses and separation in SFC").

Changes in Z are a particular bane to SFC but do not affect, or are less noticeable in, standard liquid chromatography. A34 at 2:56-60 ("The compressibility of the pumping fluid directly effects volumetric flow rate and mass flow rate. These effects are much more noticeable when using compressible fluids such as carbon dioxide in SFC rather than fluids in liquid chromatography") (emphasis added); *see* also *id*. at 1:10-13.

### C.    What Causes Changes in Compressibility and Why Are Such Changes so Problematic in SFC?

The compressibility factor Z of a fluid is a function of its pressure and temperature. *See*, *e.g.*, A34 at 2:31-35 ("The pumps can change the length of compression to account for changes in compressibility with pressure and temperature. Methods in the prior art calculate ideal compressibility based on measured temperature and pressure"); *see also* 2:60-64.

In gradient elution chromatography, changes in Z can result from the mixing of two different fluids from two different flow streams into a combined mobile phase. When the two flow streams mix, changes in their viscosity and pressure

result that cause the ripples and "noise" that impair performance of the chromatography system.  A34 at 1:14-52 and 2:23-26.

The SFC methods disclosed and claimed in the '767 patent likewise mix two flow streams of two different fluids into a single mobile phase and thus suffer from resulting changes in Z.  Specifically, the claims recite two flow streams, the first containing a "highly compressed gas, compressible liquid, or supercritical fluid" (collectively, a "compressible fluid"), such as $CO_2$; and the second containing a relatively incompressible liquid, such as methanol.  A1274 (Claim 1) and A35 at 4:34-51.  When "a compressible fluid is mixed with an incompressible fluid, . . . a major change in the viscosity of the fluid and in the pressure drop across a chromatographic column" can result.  A34 at 1:25-35.

The two flow streams are illustrated in Figure 2 (A33), reproduced below:



FIGURE 2

In this figure, tank 10 holds a compressible fluid, $CO_2$, and supplies it to pump 12. Pump 12 pumps the $CO_2$ against back-pressure regulator 30, which sits between pump 12 and the junction of the first and second flow streams. The second flow stream emanates from pump 16, which pumps the relatively incompressible fluid, such as methanol. The two flow streams combine to form a single mobile phase. *See* A35 at 4:34-51 and A36 at 5:28-54.

There is also a second, independent factor wreaking havoc with Z. Changes in Z result simply from pumping a highly compressible fluid like $CO_2$. This factor is not present in standard liquid chromatography. As the patent explains, "[p]umping compressible fluids, such as carbon dioxide (CO2), at high pressure in SFC systems while accurately controlling the flow, is more difficult than that for a liquid chromatography system." A34 at 1:11-14. The pump must first compress the compressible fluid before it can deliver the fluid to the mobile phase. But when a compressible fluid like $CO_2$ is compressed, it heats up and expands and, as a result, its density decreases. When the heat is transferred to the pump body (through conduction), the fluid cools and density increases. A34 at 1:53-60 and 2:2-8; A37 at 7:3-6. These fluctuations in temperature and density caused by pumping a compressible fluid result in corresponding changes in Z. A34 at 2:57-60; A35 at 3:65- 4:18. The two factors together (pumping a compressible fluid and mixing two flow streams) inordinately complicate SFC. A34 at 1:7-60.

The pump delivering the compressible fluid is more affected by changes in Z than the pump delivering the relatively incompressible fluid.  A34 at 1:38-46 ("As the column head pressure increases during the gradient, a larger percentage of each pump stroke would be used up compressing the fluid instead of delivering flow. With an uncompensated pump, the delivery rate becomes a small fraction of the flow setpoint.  When a second pump is added to a system to deliver an incompressible fluid under high pressure, its delivery rate is unaffected by the increasing pressure"); *see also* A400 at ¶ 17 ("At or near SFC conditions, the first flow stream of the present invention experiences large changes in Z (i.e., compressibility factor) over small fluctuations in pressure as compared to the second flow stream of relatively incompressible fluid").

Pumping a compressible fluid like $CO_2$ at high pressure dictated the need in the prior art SFC systems for DCC.  *See* A34 at 2:23-33.  In the prior art SFC systems, Z would change with, and even during, virtually every pump stroke. Thus, a mechanism was needed for adjusting the pump's compressibility compensation each time Z changed.  *Id.* at 2:23-26.  A CCC setting alone could not do the job because it would either under- or over-compensate for Z.  *Id.* at 2:17-19. Adding to the complexity, the compressible fluid would then mix with the relatively incompressible fluid, causing additional changes in Z, as discussed above.  Thus, these two culprits behind changes in Z (pumping a compressible

fluid and mixing two flow streams) make SFC far more complicated to perform than standard liquid chromatography. *Id*. at 1:10-14 and 2:57-60 ("These effects are much more noticeable when using compressible fluids such as carbon dioxide in SFC rather than fluids in liquid chromatography").

### D.    The Prior Art Methods of Compensating for Changes in Z

As one would expect from the above discussion, the trick to performing SFC in an acceptable manner is to compensate for changes in Z and thus prevent the noise and ripples that interfere with separation and accuracy. As the patent explains, "[w]ith the correct Z, a pump can be controlled to nearly eliminate flow or pressure ripple." A34 at 2:14-16. Prior art SFC systems used pumps that could compensate for the ever-changing Z by using DCC (also known as "variable compressibility compensation"). To compensate for changes in Z, "the more expensive and better liquid chromatography pumps have compressibility adjustments to account for differences in fluid characteristics." *Id*. at 2:23-26. In particular, "[h]igh-pressure SFC pumps have an extended compressibility range and the ability to dynamically change the compression compensation." *Id*. at 2:27-29; *see also id*. at 1:21-25 ("Pumps used for supercritical fluid chromatography typically require an extended compressibility compensation range plus a dynamically variable compressibility compensation range to accurately deliver a desired flow rate and fluid composition").

The prior art SFC pumps used various empirical methods to adjust the optimum compressibility compensations on the fly.  *See* A34 at 2:27-55.  But these prior art DCC methods were "somewhat limited since they do not completely compensate for the compressibility."  *Id*. at 2:51-53.  That is, the DCC adjustment would run slightly behind the changes in Z and never quite catch up.  In addition to being complicated, DCC is expensive.  A35 at 3:48-50 ("The hardware and methods for performing precise compressibility in a laboratory-scale pumps are difficult and expensive"); A36 at 5:61-65 ("Typically, pumping compressible fluids at or near SFC pressures requires that the pump must be monitored and adjusted to change the nature of how it compresses and delivers the fluid.  This type of monitoring and adjustment in the SFC process is difficult and expensive").  *See also* A400 at ¶¶ 16-17 ( DCC is "complicated and imperfect").

### E.    Compressibility Compensation:  CCC *vs*. DCC

Pumps used in the SFC systems of the '767 patent—typically "reciprocating" pumps—perform two functions.  First, they compress the fluid and then they deliver the fluid to the rest of the SFC system.  *See* A34 at 1:61 – 2:15 (explaining the inner workings of reciprocating pumps used in SFC systems).  Compressibility compensation, whether constant or dynamic, is simply an adjustment of the length of the piston stroke in the pump chamber to compensate for the Z of the compressible fluid being pumped.  *Id*. at 2:31-33.  The

compensation setting is based on the known volume of the fluid and its known compressibility factor Z.    *Id*. at 2:10-15; *see also* A13.    With CCC, the compressibility compensation is fixed regardless of changes in Z, while with DCC, the compressibility compensation changes to keep up with changes in Z.

More specifically, CCC is the fixed level of compression in the compression phase of the pump stroke used to compensate for the fluid's compressibility.    The "constant" in CCC is fixed by the selection of a setting that determines the length of the compression phase of the pump stroke preceding the delivery phase of the stroke.    The selected setting determines how far the piston must travel in the chamber to compress the fluid.    A34 at 2:10-15 and 2:31-33.    With CCC, the compensation for Z never changes (even if the Z of the fluid changes).    The length of the compression phase of the stroke is fixed.    The user sets the compensation level to a certain Z and leaves it there.    Set it and forget it.

CCC works well enough if the temperature or pressure of the fluid, and hence its Z, does not drastically change.    *Id*. at 2:60-64.    But if Z changes over a large range, a pump set at CCC will either under- or over-compensate for Z, causing ripples in flow and pressure.    *Id*.; *see also id*. at 2:14-22.

That's where DCC comes in.    As explained above, in SFC systems with two flow streams, one of which contains a compressible fluid, the compressible fluid's Z fluctuates throughout the process, causing ripples and noise that mar

performance.   DCC is thus used to adjust the compression phase of the pump stroke dynamically, each time Z changes with changes in pressure, temperature, and ultimately the density of the compressible fluid.  *See* A34 at 2:17-55.

In other words, imagine a hypothetical SFC pump with a range of possible Z compensation settings, Levels 1-100.  With CCC, the user sets the level to, say, 50, and the pump compresses at Level 50 no matter how the fluid behaves.  But with DCC, the pump may start at, say, Level 50, then, as the Z of the fluid changes during the pump stroke, the compressibility compensation adjusts to Level 100, then to 20, etc., depending on the DCC calibrations (based on continuously measuring temperature and pressure).  A34 at 2:27-37.

In the prior art, the use of CCC alone, without DCC, could not by itself eliminate all flow ripples in the claimed compressible flow stream because CCC could not account for all changes in Z caused by pressure and temperature changes.  A34 at 2:60-64 ("The assumption of constant compressibility leads to optimal minimization of fluid fluctuation at only one point of the pressure/temperature characteristic, ***but at other pressures and temperatures, flow fluctuations occur in the system***") (emphasis added).   In other words, CCC works just fine when temperature and pressure (and hence the Z of the compressible fluid) remain constant (or vary only slightly) because the CCC setting roughly matches the Z of the fluid.  But when pressure and temperature of the compressible fluid vary over a

larger range, as is typically the case when pumping a compressible fluid like $CO_2$ at high pressure, then Z changes dramatically and the compressibility compensation level must be recalibrated to account for the changes.  *See* A36 at 5:57-64 ("This method directly addresses the problem with methods and pumps in the prior art of SFC: as the pressure changes on the pump outlet, ***new compressibility compensations must be determined*** and the pump adjusted. Typically, pumping compressible fluids at or near SFC pressures requires that the pump must be monitored and ***adjusted to change the nature of how it compresses*** and delivers the fluid") (emphasis added).

As seen in the previous section, DCC is difficult to implement and is expensive. The goal, then, was to find a way to use a pump having only CCC capability (*i.e.*, a limited compressibility compensation range, A35 at 3:29-30) but no DCC capability while still minimizing pressure and flow ripples caused by changes in Z and thus preventing errors in SFC separation and analysis.  Achieving this goal would save the expense of DCC-capable pumps while still delivering reproducible, accurate results.  *See* A36 at 5:55-65 ("The present invention avoids the need for monitoring and updating high-pressure SFC pumps for variable compressibility compensation . . . this type of monitoring and adjustment in the SFC process is difficult and expensive" ).

**F.    The Innovation of the '767 Patent:  Limit Z so that CCC Alone, without DCC, Can Do the Job**

The inventors recognized that the expense and complexity of DCC could be avoided by conditioning the compressible fluid (*e.g.*, $CO_2$) so that it behaves as if it were less compressible.  If the compressible fluid acts less compressible, then DCC can be avoided because Z will vary much less such that the CCC setting alone is good enough.  For example, in the above hypothetical, Z varies between Levels 48 and 52, with CCC set to 50.  *See, e.g.*, A35 at 3:65 – 4:18 ("The density of the fluid in the pump varies over a carefully controlled range during refill and delivery.  If the inlet pressure is relatively high the fluid is less compressible. . . ."); A36 at 5:19-22 ("If the inlet pressure is constant, the fluid inlet temperature is constant, and the pressure difference across the pump is held constant, then there is no change in compressibility of the fluid"); *id*. at 6:45-51 ("The flow stream becomes far less susceptible to compressibility compensation problems than prior art SFC methods"); A37 at 7:10-14 ("If the inlet pressure to the pump 12 is constant, the fluid inlet temperature is constant 32, and the pressure difference across the pump is held constant, then there are only minor changes in compressibility of the fluid").

As discussed in Section II.C above, the compressibility factor Z is a function of pressure and temperature.  Thus, if either pressure or temperature, or both, can

be controlled, Z can also be controlled such that CCC alone, without DCC, can be used to compensate for Z within the narrowed range.

The patented inventions, therefore, avoid the need for DCC by controlling pressure of the first flow stream (the one containing the compressible fluid) such that Z does not change significantly. One way to do so is to place a back-pressure regulator downstream from the pump. *See* A35 at 3:58-67; A36 at 5:28-54. The back-pressure regulator does not itself compensate for compressibility but rather reduces the variation in the compressibility of the fluid. A35 at 4:9-18. To control Z even more, the temperature of the fluid in the pump can also be controlled. A37 at 7:6-16. Because Z does not change significantly, DCC is not needed.

Of course, even if the pressure and/or temperature is controlled such that Z remains steady, CCC is still needed to eliminate flow or pressure ripples. *See* A34 at 2:14-16 ("With the correct Z, a pump can be controlled to nearly eliminate flow or pressure ripple"); *id.* at 2:56-64. DCC is not needed, however, because the Z is not fluctuating wildly over a wide range. *Compare* A36 at 5:59-61 ("as the pressure changes on the pump outlet, new compressibility compensations must be determined and the pump adjusted"). In other words, by limiting the range within which Z varies, "new compressibility compensations" need not be calculated and the system can run just fine with a fixed compressibility compensation setting (*i.e.*, CCC).

In summary, the solution to the expense and complexity of DCC is to limit the variation in Z by controlling the pressure and/or temperature of the compressible fluid so that CCC alone, without DCC, can deliver a controlled flow rate. Only CCC is needed because Z stays within a narrow range. DCC is not needed because now the Z of the compressible fluid does not fluctuate wildly over an extended range. As Dr. Chordia explained, this solution represented a major advance over the prior art:

> 16.    The present invention represents a major advance because it not only eliminated the need for dynamic compressibility compensation and related required equipment, but also the invention provides greater control for highly compressible fluids beyond that which dynamic compressibility compensation could provide.

> 17.    At or near SFC conditions, the first flow stream of the present invention experiences large changes in Z (i.e., compressibility factor) over small fluctuations in pressure as compared to the second flow stream of relatively incompressible fluid. The inventors discovered that by controlling the pressure for the first flow stream, they could limit the range of Z and thereby provide a controlled flow rate in an unmodified HPLC pump. Thus, for the first time, the inventors achieved the desired control of the first flow stream while eliminating the complicated and imperfect dynamic compressibility compensation control method step.

A400.

### G.    The Claimed Methods:  Control Pressure, then Pump at a CCC

The claims reflect the solution discussed above.  First, the range of Z is limited by controlling pressure.  For example, Claim 1 recites the general step of "controlling pressure":

> controlling pressure of a first flow stream containing a highly compressed gas, compressible liquid, or supercritical fluid, by maintaining an elevated pressure rate after said outlet of said pump but prior to joining a second flow stream of a relatively incompressible liquid; and . . .

A1274 (first step of Claim 1).

Dependent Claim 2, in turn, specifies that the step of "controlling pressure" is accomplished with a back-pressure regulator:

> said maintenance of an elevated pressure rate after said outlet of said pump being accomplished by delivering said fluid first flow stream from said pump against a ***backpressure regulator valve*** installed in said first flow stream downstream of said pump and upstream to the joining of said first flow stream with said second fluid flow stream containing a relatively incompressible liquid.

A1274 (emphasis added).

In an alternative embodiment, the temperature of the first flow stream is also controlled, in addition to controlling the pressure.  Claim 7, for example, adds the step of controlling temperature.  *See* A1275 ("controlling temperature of said first flow stream").  As discussed above, controlling temperature further limits Z and thus makes the compressible fluid less compressible.  *See* A35 at 4:1-3.

The Board apparently concluded that this first step ("controlling pressure") is the only step of the claimed methods and that the second step ("pumping . . . at a constant compressibility compensation") is merely the result of controlling pressure and, therefore, a pump with CCC capability is not needed.   A13-18. Controlling pressure minimizes the variation in Z, but it does not compensate for compressibility during pumping of a compressible fluid.  A36 at 5:11-27.

As prefaced above, the first step creates the conditions under which pumping at a CCC, without DCC, can work in an SFC system.  But CCC is still needed to pump the compressible fluid, even when changes in Z are minimized.  The only thing that is avoided is DCC, not CCC.  *See* A35 at 3:16-19 ("In particular, the invention pertains to converting a pump with a constant compressibility compensation for use in gradient elution supercritical fluid chromatography (SFC)"); A36 at 5:10-14 ("The method of the present invention permits unmodified HPLC pumps to deliver accurate flow composition under isocratic conditions, despite having limited compressibility compensation ranges and no ability to dynamically compensate for compressibility changes"); *id.* at 6:26-32 ("Because the pressure on the pump outlet is constant due to the back-pressure regulator 30, the same compressibility compensation is performed regardless of the flow. . . . Therefore, a different compressibility compensation scheme is not required when flow rate changes").  In other words, only one compressibility

compensation scheme is needed (*i.e.*, CCC), and different compensation schemes (*i.e.*, dynamic) are not needed because Z hardly fluctuates. *Id.* at 5:57-61 ("This method directly addresses the problem with methods and pumps in the prior art of SFC: as the pressure changes on the pump outlet, new compressibility compensations must be determined and the pump adjusted").

That a "different" or "new" compressibility compensation scheme is not required, as seen in the passages quoted above, does not mean that no compensation scheme is required. It simply means that the compressibility compensation need not be adjusted to keep up with relatively minor changes in Z. But compressibility compensation must still be used because the compressible fluid must still be compressed (even if its Z is held constant) before it can be delivered into the flow stream. *See*, *e.g*., A34 at 1:61-2:16; A36 at 5:50-65 and 6:26-32. Only when Z changes is DCC needed. Because Z hardly changes, however, CCC alone can optimize performance without DCC. *See* A34 at 2:60-64.

This need for pumping at a CCC, without DCC, is reflected in the second step of Claim 1:

> **pumping** of said first flow stream consisting of a pure fluid resulting in delivery of a controllable flow rate of said first flow stream **at a constant compressibility compensation** *without the need for dynamically compensating said pump* for compressibility changes in said first flow stream.

A1274 (emphasis added).

## III.   THE PRIOR ART FAILS TO DISCLOSE PUMPING AT CCC WHILE AVOIDING DCC

The examiner and Board held that all claims of the '767 patent were anticipated or rendered obvious by the following prior art references:

1.   U.S. Pat. No. 4,942,018 to Munk ("Munk '018").  A291-314.

2.   U.S. Pat. No. 4,032,445 to Munk ("Munk '445").  A332-38.

3.   U.S. Pat. No. 4,882,063 to Allington *et al*. ("Allington").  A315-31.

4.   Articled entitled "Apparatus and Separations in Supercritical Fluid Chromatography," by Klesper *et al*. ("Klesper").  A339-50.

None of the prior art references teaches "pumping . . . at a CCC." Specifically, as Waters's expert, Dr. Chordia, explains, Munk '018, Munk '445, and Allington disclose syringe pumps.  But syringe pumps have no mechanism for providing CCC.  A401-402 at ¶¶ 19-20, 22-24, and 27.  Aurora did not submit expert testimony or other evidence to the contrary.  At any rate, the Board noted that both parties and the examiner agree that syringe pumps have no compressibility compensation adjustment mechanism.  A19.  Nor is there any other evidence that syringe pumps are capable of pumping at a CCC.[4]

---

[4]  Klesper was used as a primary reference for certain rejections, but the Board overturned those rejections.  A8-10, A23-26.  Klesper was also cited as a secondary reference in certain § 103 rejections but not for its disclosure of a pump. *See* A8-10, A163-65, A181-85, A202-09.  The Board also relied on two secondary references: (1)  U.S. Pat. No. 5,944,048 to Bump et al. ("Bump"), A272-90; and (2) admitted prior art described in the '767 patent.  Neither reference was cited for disclosure of the limitation at issue here.  *See*, *e.g*., A42-43, A158-59, A173-74.

Given that the "invention pertains to converting a pump with a constant compressibility compensation" for use in SFC (A35 at 3:16-19), and given that the claims recite "pumping . . . at a CCC" but without the need for DCC, the cited prior art—which did not disclose a pump capable of CCC—could not possibly have anticipated the '767 patent or have rendered it obvious.

## IV.   THE UNDERLYING *INTER PARTES* REEXAMINATION

### A.   Procedural History

In the fall of 2011, Waters sued Aurora for infringement of the '767 patent and a second patent (also the subject of an *inter partes* reexamination on appeal to this Court in Appeal No. 15-1280). The case was filed in the District of Delaware. In February 2012, Aurora filed its request for *inter partes* reexamination. The USPTO granted the request on March 27, 2012. A364-65. Aurora moved to stay the Delaware litigation pending the outcome of the reexamination. The district court originally denied the stay but, upon reconsideration a few months later, granted the stay on January 25, 2013. *See* A1529.

In the underlying reexamination, the examiner adopted certain § 102(b) anticipation and § 103(a) obviousness rejections proposed by the third-party requester, Aurora. After several rounds of briefing by the parties, the examiner rejected all claims and concluded the proceedings with a right of appeal notice ("RAN") on February 20, 2013. A1117-1160. In particular, the examiner relied

on Munk '445, Munk '018, Allington, and Klesper, along with certain secondary references.  *See* A8-10 (Board's summary of the examiner's rejections).

Waters appealed to the Board, which heard oral argument on April 23, 2014. A1423.  The Board issued its decision on September 25, 2014.  A1-27.  In its decision, the Board affirmed the rejections based on Munk '445, Munk '018, and Allington as primary references but reversed as to the rejections based on Klesper as the primary reference.  *See* A8-10 and A19-26.  As prefaced above, the three primary references disclose only syringe pumps. The syringe pumps in these references do not have CCC mechanisms and are not capable of providing CCC. A401-403.  As discussed below, each of the affirmed rejections rested on the Board's mistaken conclusion that a syringe pump with no capacity for CCC could nonetheless provide CCC simply by pumping against an elevated pressure.  A14, A19.  But no evidence supported that conclusion.

### B.     The Board's Claim Construction Error

The Board's affirmance of the rejections rests exclusively on the construction of the "pumping . . . at a CCC" step.  A11.  This step is part of each of the independent claims (Claims 1, 7, and 13) and thus in all dependent claims.

The Board held that a syringe pump lacking a capacity for CCC could still meet the claims because CCC is somehow not a claim requirement.  A16.  In

effect, the Board read "pumping . . . at a CCC" right out of the claim.  This reading of the recited claim limitation out of the claim appears to rest on three basic errors.

First, the Board appears to have incorrectly equated "pumping . . . at a CCC" with pumping at *no* CCC.  In particular, the Board relied on the following statement:  "The pump can run at different flowrates in an open loop with no compressibility compensation."  A16 (citing '767 patent at 6:2-3).  But this statement does not mean that the pump may lack a capacity for CCC and should not be understood to refer to CCC.  Given the entire context of the patent, this statement must be read to mean that the pump runs *without* DCC, not without CCC.  Indeed, this same passage goes on to say, just two lines later, that "[i]f the pump is pumping at the same pressure, the flowrate and composition is controllable without the need for <u>dynamic</u> compressibility compensation."  A36 at 6:5-8 (emphasis added).  In the next paragraph, the patent teaches that "[b]ecause the pressure on the pump outlet is constant due to the back-pressure regulator 30, <u>the same compressibility compensation is performed</u> regardless of the flow."  *Id*. at 6:26-28.  In other words, the pump must still compensate for compressibility, but it can use one compensation setting and need not switch to a new compensation setting because Z hardly changes.  *Id*. at 6:31-32 ("Therefore a *different* compressibility compensation scheme is not required when flow rate changes") (emphasis added).  In other words, a CCC is still needed but DCC is avoided.

In incorrectly relying on the statement that a pump can run with "no compressibility compensation," the Board, in effect, held that <u>no</u> compressibility compensation is the same as "*a* constant compressibility compensation." But that paradox makes no sense. The claims require "pumping . . . at a CCC," not pumping with no CCC. And no compensation is not the same as constant compensation. The only type of compressibility compensation that is avoided is DCC, not CCC. A36 at 5:1-27.

Second, the Board relied on the examiner's statement that delivery of a controllable flow rate at CCC "is merely the result of placing a back pressure regulator downstream of a pump to create an unchanging compression." A14 (quoting RAN at 6).[5] The Board then concluded that "the compression of the fluid in the pump will be set by the back pressure." *Id.* Based on these conclusions, the Board held that a syringe pump with no CCC mechanism acting against a constant, elevated back pressure performs the same as a pump with a CCC mechanism. A14, A19. But no evidence whatsoever supports these conclusions. Indeed, these conclusions are contrary to the teachings of the patent.

---

[5] More specifically, the examiner concluded that "The patent owner's claimed inventive step (*i.e.*, pumping at CCC) is merely the result of placing a back pressure regulator downstream of a pump to create an unchanging compression. Since the prior art teaches the placement of a back pressure regulator downstream of a pump, the prior art apparatus would necessarily provide the claimed desired end result (pumping at CCC). Therefore, the patent owner's process claims do not differentiate from the structure disclosed by the prior art." A1130. But the examiner did not rely on any evidence of record to support this conclusion.

The Board appears to have confused compression with compressibility and failed to account for the third "C" in CCC, namely, compensation. The back pressure regulator merely holds pressure at a certain level, thus creating the conditions under which a pump with only CCC, but without DCC, can be effective. Because the compressibility factor Z of a fluid depends, *inter alia*, on pressure, the back pressure regulator, in effect, limits the range of Z, making the fluid in the pump less susceptible to compressibility changes. In other words, the back pressure affects only the *compressibility* of the fluid. *See* A35 at 3:58-67; A36 at 5:10-27; A37 at 7:3-17. It does not itself provide compression, let alone compensate for compressibility. Compression is the job of the piston. The pump must still tell the piston how far to travel during the compression phase of the stroke. A34 at 1:61 – 2:16. That's where the compensation setting comes in. While the compressibility of the fluid is limited, it is still compressible to some extent and thus a compressibility *compensation* scheme is still needed. A34 at 2:60-64.

Third, the Board apparently misunderstood Dr. Chordia's testimony, which is the only testimony of any technical expert in the underlying reexamination. The Board thought, incorrectly, that Dr. Chordia was conflating CCC with DCC. A15. But a closer reading of Dr. Chordia's affidavit shows that he understands the difference. Dr. Chordia specifically used the term "dynamic compressibility

compensation" in paragraphs 16 and 17 of his declaration and then, in paragraph 19, defined and used the term "constant compressibility compensation." *See* A400 at ¶¶ 16-17 and A401 at ¶ 19. He specifically testified that syringe pumps are not "capable of providing CCC." A401 at ¶¶ 20, 22, 23. He did not use the term "dynamic compressibility compensation" or "DCC" in these paragraphs and thus understood and conveyed a difference.

## SUMMARY OF ARGUMENT

This is the case of the missing claim limitation. In effect, the Board read out of the claims an express limitation. Had the claims been read to include this limitation, it would have distinguished the prior art. Accordingly, the decisive issue in this case is whether the Board properly construed the key limitation-- namely, the step of "pumping . . . at a constant compressibility compensation ["CCC"]." The Board equated pumping at a CCC with pumping at no CCC and found, without any support in either the intrinsic or extrinsic record, that merely pumping a compressible fluid against an elevated back pressure would result in pumping at a CCC. That is not the case.

The Board's construction is unreasonably broad because it divorces the claims from the context of the patent specification, the underlying technology, and the purpose of the invention, as understood by one of ordinary skill in the art. The patent teaches that the key to performing SFC separation and analysis successfully

is to compensate for changes in the compressibility factor (known as "Z") of the compressible fluid. Pumping a compressible fluid and then mixing it with a relatively incompressible liquid (as recited in the claims) causes Z to vary wildly. In the prior art, dynamic compressibility compensation ("DCC") was used to compensate for Z as Z changed continuously and dramatically during the SFC run. But DCC is expensive, complex, and imperfect. DCC doesn't always keep up with ever-changing Z. The inventors discovered that if Z could be held within a narrow range, a fixed (*i.e.*, constant) compressibility compensation setting would be good enough and thus the expense and complexity of DCC could be avoided.

In keeping with the purpose of the invention, the claims recite the step of pumping at a CCC "without the need for dynamically compensating said pump for compressibility changes in said first flow stream." A1274. The effect of the Board's construction, however, is that CCC is also avoided. This reading ignores the Summary of Invention, which states that the pump must have a CCC capacity:

> In particular, the invention pertains to converting a pump with a constant compressibility compensation for use in gradient elution supercritical fluid chromatography (SFC).

A35 at 3:16-20. In keeping with this disclosure, all independent claims recite the step of "pumping . . . at a CCC." Given this context, pumping at "a" CCC cannot possibly mean pumping at *no* CCC.

The claimed methods start with the step of controlling pressure (*e.g.*, placing a back pressure regulator in the flow stream containing the compressible fluid). Doing so creates the conditions under which CCC, without DCC, can be successful in delivering a steady flow of the fluid stream (*i.e.*, without ripples). Controlling pressure minimizes variations in Z. Because Z does not change significantly during the SFC run, DCC is not needed. Controlling pressure does not itself compress the fluid or compensate for its compressibility, as the Board wrongly concluded. Indeed, no evidence supports that conclusion. Even when pressure is controlled, CCC is still needed. As the patent makes clear, CCC leads to optimal performance when pressure is held constant. But once the pressure of the compressible fluid changes, CCC is inadequate and DCC is needed. *See*, *e.g.*, A34 at 2:56-64; A400 at ¶¶ 16-17.

Because the Board apparently misunderstood these teachings, it read CCC out of the claims. The result is that the Board relied on so-called syringe pumps in the cited prior art to find that the claims were anticipated or made obvious. But syringe pumps lack any capacity for CCC and thus cannot provide CCC. That evidence is undisputed. Given that the cited prior art fails to disclose the step of "pumping . . . at a CCC," the Board erred in affirming rejection of the claims.

# ARGUMENT

## I.   STANDARD OF REVIEW

In general, this Court reviews the Board's legal conclusions *de novo* and fact findings for substantial evidence. *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 976-77 (Fed. Cir. 2014) (reviewing appeal of *inter partes* reexamination). This case turns on a claim construction issue—namely, whether the Board improperly read "pumping . . . at a constant compressibility compensation" out of the claims.   The Supreme Court recently clarified that claim construction is reviewed *de novo* to the extent that it is based on the intrinsic record and for clear error to the extent it relies on subsidiary fact findings.   *Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-42 (2015); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1282-83 (Fed. Cir. 2015).   In the wake of *Teva*, this Court has reviewed the Board's claim construction exclusively *de novo* when that construction did not rely on fact findings.   *See Cuozzo Speed Techs.*, 778 F.3d at 1283; *In re Imes,* 778 F.3d 1250, 1252 and n.1 (Fed. Cir. 2015).   In this case, the Board appears to have based its claim construction substantially on the intrinsic record.   *See* A11-19.   As such, this Court should review the claim construction *de novo*.

This case also involves questions of anticipation and obviousness. Anticipation is a fact question reviewed for substantial evidence, while obviousness is a question of law reviewed *de novo* based on underlying fact

findings reviewed for substantial evidence. *Tempo Lighting*, 742 F.3d at 976-77;

*K/S HIMPP v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1364 (Fed. Cir. 2014).

## II.    THE BOARD ERRED BY READING A LIMITATION OUT OF THE CLAIMS

In USPTO cases involving an unexpired patent, as in this case, the Board applies the broadest reasonable construction, and this Court reviews the construction on that basis. *In re Imes*, 778 F.3d at 1252; *In re Stoller*, No. 2014-1271, 2015 WL 202186, at *2 (Fed. Cir. Jan. 15, 2015) (not selected for publication). The broadest reasonable construction standard, however, did not give the Board *carte blanche* to read an express limitation out of the claims. The standard is the not the broadest construction whatsoever but the broadest construction that is *reasonable*. Thus, the Board's construction must still conform to the specification, as understood by one of ordinary skill in the art. *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011) ("While the Board must give the terms their broadest reasonable construction, the construction cannot be divorced from the specification and the record evidence"); *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010) ("The broadest-construction rubric coupled with the term 'comprising' does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention. Rather, claims should always be read in light of the specification and teachings in the underlying

patent"); *In re Buszard*, 504 F.3d 1364, 1367 (Fed. Cir. 2007) (reversing Board's anticipation rejection because it employed an unreasonably broad construction that ignored evidence as to how one or ordinary skill would understand the words of the claim).  A reasonable construction should align with the purpose of the invention and the problem it solves.  *See*, *e.g.*, *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) ("the district court's construction of 'automatically' is consistent with one of the problems the invention sought to redress: avoiding the manual re-entering of the same information for every college application a prospective student desires to complete"); *Synthon Pharms., Inc. v. Sanofi-Aventis U.S. LLC*, Appeal No. 2013-000570, 2013 WL 1310673, at \*7 (P.T.A.B. Mar. 27, 2013) (reversing examiner's claim rejections and relying on the stated purpose of the invention to help interpret the disputed claim term).

Although a case about statutory construction, the Supreme Court's recent opinion in *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015), is instructive because it teaches that in textual exegesis, a disputed term cannot be divorced from its context.  That is also the point of the broadest reasonable construction standard.  In *Yates*, a commercial fisherman threw undersized groupers overboard to destroy evidence that he had violated federal fishing regulations.  He was charged with violating a provision of the Sarbanes-Oxley Act prohibiting destruction of any "tangible object" to obstruct a federal investigation.  Reasoning that a fish is a

"tangible object," the lower courts convicted Yates. The Supreme Court reversed. The provision at issue was intended to criminalize document shredding, as practiced by Enron and Arthur Andersen to hide evidence of accounting fraud. *Id*. at 1081. As such, "tangible object" could not be broadly construed to apply to any object in the physical world (*e.g*., a fish). Given the background and purpose of the Sarbanes-Oxley Act, the term had to be read as covering only objects used to record information, such as documents. *Id*.

In this case, the Board has committed a similar error of interpretation by relying on a construction that is divorced from the technological background and purpose of the '767 patent. The intrinsic record shows that "pumping . . . at a CCC" cannot mean "no" CCC or that CCC is merely the result of pumping against an elevated pressure, as the Board concluded.

## A.   The Patent Specification Teaches that the Pump Must Have a Capacity for CCC and Use it

The patent emphasizes that "the invention pertains to converting ***a pump with a constant compressibility compensation*** for use in gradient elution supercritical fluid chromatography (SFC)." A35 at 3:16-19 (emphasis added). Thus, the patent immediately reveals that the pump must have a CCC mechanism. The patent goes on to explain that the "method of the present invention permits unmodified HPLC pumps to deliver accurate flow composition under isocratic conditions, despite having ***limited compressibility compensation ranges*** and no

ability to dynamically compensate for compressibility changes." A36 at 5:11-15. In other words, the pump must still have a compressibility compensation mechanism. Use of "the invention" and "the present invention" suggests that the CCC requirement applies to every embodiment. *See*, *e.g.*, *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).

The pump must have a capacity for CCC because it needs to pump a compressible fluid and compensate for the fluid's Z. Without the correct Z compensation, flow and pressure ripples will occur that will cause errors in the SFC process. A34 at 1:38-41, 2:2-26; *see also* A36 at 5:50-55 (" . . . the flow rate out of the pump can be calibrated because the pump is operating at a speed, but the flow stream from the pump is leaving at a rate less than an ideal pump rate because energy is used *compressing* the fluid in the pump") (emphasis added).

The purpose of the invention is not to avoid CCC, which is the effect of the Board's "no CCC" claim construction, but rather to avoid DCC. *See* A35 at 3:20-57; A36 at 5:1-27, 5:55-65. Thus, the claimed methods permit "unmodified HPLC pumps to deliver accurate flow composition under isocratic conditions, despite having limited compressibility compensation ranges *and no ability to dynamically compensate* for compressibility changes." A36 at 5:11-15 (emphasis added). In other words, the pump must still have a limited compressibility compensation range, which must be set to a fixed (*i.e.*, constant) level to provide constant

compressibility compensation.    But the pump does not need a dynamic compensation mechanism to adjust compensation on the fly during operation.

Pumping against an elevated pressure does not result in CCC, as the examiner and Board concluded.    A14, A18-19.    Neither the examiner nor the Board cited any evidence, such as expert testimony, on this point.    There is no evidence, intrinsic or extrinsic, that pumping against an elevated or constant pressure results in pumping at a CCC.    The ruling appears to be based on attorney argument, which is not evidence and cannot create a dispute.    *See, e.g. Suffolk Technologies, LLC v. AOL Inc.*, 752 F.3d 1358, 1367 (Fed. Cir. 2014).[6]

Rather, controlling the pressure (for example, by placing a back-pressure regulator in the first flow stream) creates the conditions under which CCC, without DCC, can be effective.    As the patent explains, the result of controlling pressure is to limit variation in Z throughout the SFC run.    *See* A35 at 3:58-4:6; A36 at 5:19-22; A37 at 7:10-17.    Because the compressible fluid is thus conditioned to be less compressible such that Z varies within a limited range, the pump can be set to one compressibility compensation level and left there.    Set it and forget it.    The system does not need to calculate a new compensation scheme (*i.e.*, DCC) every time Z changes because Z does not drastically change.    A36 at 5:11-27.

---

[6]    Thus, even if the standard of review were the more deferential substantial evidence or clear error standard, Waters would easily overcome that standard because there was no evidence of any kind to support the conclusion.

The invention, therefore, is not merely pumping against an elevated or controlled pressure but rather pumping *at a CCC* against an elevated or controlled pressure.   The result of pumping the compressible fluid at a CCC against a controlled pressure is a steady flow of the fluid in the mobile phase (*i.e.*, without noise or ripples), not CCC itself.  *Id*.; *see also id*. at 6:33-51.

### B.    Pumping . . . at a CCC Does Not Mean Pumping at *No* CCC

The Board improperly equated "pumping . . . at a CCC" with pumping at no CCC.   Specifically, the Board relied on this sentence: "The pump can run at different flowrates in an open loop with no compressibility compensation."  *See* A16 and A36 at 6:2-3.  But the Board read this sentence out of context, which is error.   *See Tempo Lighting,* 742 F.3d at 978 ("when read in context, the specification's isolated reference to 'capturing' low level light is not reasonably viewed as referring to photoluminescence").  When read in context, this sentence must be understood as referring to DCC, not CCC.  As argued above, the entire gist of the patent is avoiding DCC, not CCC.   The context surrounding this sentence makes this point.  For instance, the paragraph immediately before the one containing this sentence states that "[t]he present invention avoids the need for monitoring and updating high-pressure SFC pumps 12 for variable [*i.e.*, dynamic] compressibility compensation. The method directly addresses the problem with methods and pumps in the prior art of SFC: as the pressure changes on the pump

outlet, new compressibility compensations must be determined and the pump adjusted." A36 at 5:55-61. Likewise, the next paragraph states that a "different compressibility compensation scheme is not required when flow rate changes." *Id*. at 6:31-32. In other words, the SFC method can be performed with the same (constant) compressibility compensation. A different one is not needed upon changes in Z because Z hardly changes. Finally, just two lines after the sentence at issue, the specification clarifies that "If the pump is pumping at the same pressure, the flowrate and composition is controllable without the need for *dynamic* compressibility compensation." *Id*. at 6:5-8 (emphasis added). In other words, consistent with the purpose of the invention, the patented methods avoid DCC, not CCC. Thus, the previous sentence, when read in context, cannot possibly mean that pumping at a CCC is not required.

### C.    The Claim Wording Requires "Pumping . . . at a CCC"

Finally, the Board's construction conflicts with the wording of the claims, especially when read in the light of the specification. The claim wording shows that the claims cannot possibly mean pumping at no compressibility compensation or that pumping against a controlled pressure results in CCC, as the Board concluded. Thus, the Board erred in relying on the isolated sentence from the specification to read CCC out of the claims.

The claims require "pumping . . . at *a* CCC."  Use of the word "a" in patent claims means one or more but not zero.  *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("Under this conventional rule, the claim limitation 'a,' without more, requires at least one").  Thus, pumping at *a* CCC cannot mean pumping at *no* CCC.

Indeed, reading "at a CCC" out of the claim, which is the effect of the Board's construction, is reversible error.  Every claim term must be given meaning.  As a matter of law, an expressly recited term may not be read out of the claim.  *See*, *e.g*., *Becton Dickinson and Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) ("If the spring means limitation contained in claims 1 and 24—but not in claim 17—is not be read out of the asserted claims, it must require an additional element beyond that which is already called for by the hinged arm limitation"); *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003) ("Thus, the hose is expressly recited in the body of the claim and was improperly read out of the claim by the district court"); *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 749 (Fed. Cir. 1987) ("The word 'only,' however, is there and may not be read out of the claim").

In contrast, the claims all recite that the process operates "without the need for dynamically compensating said pump for compressibility changes in said first flow stream."  The whole point of the patent is to avoid DCC, as seen above.  The

Board, however, appears to have confused or conflated CCC with DCC and to have determined that pumping at a CCC is not necessary.  So while it would be correct to construe the claims to result in a controllable flow of the first fluid without the need for DCC, it would not be correct to omit CCC.

Finally, the claim wording shows that the inventors considered the term "pumping …at a CCC" to be a separate and distinct step from pumping against a controlled pressure and that CCC is not merely the result of controlling pressure, as the Board concluded.  A19.  The inventors drafted the claims to recite two or more steps, not one.  The word "pumping" is a present participle, which is an active verb.  The step of "pumping" and more particularly "pumping  . . . at a CCC" in the claimed method results in the controllable flow of the first fluid.  The claim recites this result and that is consistent with the specification.  *See*, *e.g*., A35 at 3:25-3; A36 at 5:1-27.  A construction, that provides otherwise, ignores that the claim wording links the result of controllable flow to the pumping step and not to the controlling pressure step.  Accordingly, the claim wording itself demands two distinct steps, not one.  Ignoring claim limitations when judging patentability over the prior art constitutes reversible error.  *Key Mfg. Group, Inc. v. Microdot, Inc.*, 925 F.2d 1444, 1448 (Fed. Cir. 1991).

## III.  THE CLAIMS ARE NOVEL AND NON-OBVIOUS OVER THE CITED PRIOR ART

When  correctly construed to require that the pump for the first fluid stream pump at a CCC, all of the claims are novel and not obvious.  The rejections affirmed by the Board are based on prior art that discloses only syringe pumps.  Dr. Chordia, however, testified that syringe pumps have no CCC mechanism and are incapable of pumping at a CCC.  A400-403.  The third-party requester, Aurora, never disputed that testimony, and the Board found that this fact was undisputed. A19.  Because syringe pumps cannot pump at a CCC, as everyone agrees, the prior art cannot possibly anticipate the claims or render them obvious.

It should be noted that the '767 patent even disparages syringe pumps while touting reciprocating pumps (which do have CCC capability).  *See* A34 at 1:61-2:16.  Thus, the Board erred in finding that prior art references that disclosed only syringe pumps could possibly invalidate the claims of the '767 patent.  *See Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004). ("Where the general summary or description of the invention describes a feature of the invention . . . and criticizes other products . . . that lack that same feature, this operates as a clear disavowal of these other products").

The Board compounded its claim construction error by finding that a syringe pump pumping against a controlled pressure would necessarily result in pumping at a CCC.  A14 and A19.  The Board cited no evidence for this proposition and,

indeed, there was none. (To the contrary, the only evidence of record on this point was Dr. Chordia's uncontroverted testimony that syringe pumps are incapable of pumping at CCC. *See* A401 ¶¶19-20.) The Board thus committed reversible error by basing its patentability finding on a conclusory assertion rather than actual evidence. *See*, *e.g.*, *K/S Himpp*, 751 F.3d at 1365 ("The determination of patentability of claims with this limitation therefore requires a core factual finding, and, as such, requires more than a conclusory statement from either HIMPP or the Board").

The Board did, however, cite to a website that neither party nor the examiner had introduced at any point in the underlying reexamination. *See* A14. This website says nothing about whether syringe pumps could pump at a CCC or that pumping against an elevated pressure results in CCC. But even if it had, the Board must review the evidence presented and not find evidence on its own. Thus, it was also error for the Board to find its own evidence. *See In re Imes*, 778 F.3d at 1253 ("Even if the Board had used this reasoning below, it would have constituted a new ground of rejection because it relies on 'new facts and rationales not previously raised to the applicant by the examiner'") (citation omitted); *Rambus Inc. v. Rea*, 731 F.3d 1248, 1255-56 (Fed. Cir. 2013) (holding that under the Administrative Procedure Act, Board may not rely on new evidence to support its decision).

## CONCLUSION

For the reasons stated above, Waters respectfully requests that this Court reverse the Board's decision and hold that all claims of the '767 patent are patentable over the cited prior art. As such, Waters is entitled to a reexamination certificate confirming patentability of the claims.


Dated:  April 6, 2015                    Respectfully submitted,

                                         /s/ Erik Paul Belt
                                         ERIK PAUL BELT
                                         DEBORAH M. VERNON
                                         KIA LYNN FREEMAN
                                         MCCARTER & ENGLISH, LLP
                                         265 Franklin Street
                                         Boston, MA 02110
                                         (617) 449-6500 (telephone)
                                         (617) 607-9200 (fax)
                                         ebelt@mccarter.com

                                         *Attorneys for Waters Technologies Corp.*

# ADDENDUM

 United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## PRIORITY MAIL EXPRESS LABEL NO. EK 219335253US (11-21-2014)

| APPLICATION NO | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO |
|---|---|---|---|---|
| 95/001,910 | 02/29/2012 | 6561767 | 1329-201 | 9039 |

13871          7590     09/25/2014
McCarter & English LLP / Waters
265 Franklin Street
Boston, MA 02110

| EXAMINER | |
|---|---|
| ENGLISH, PETER C | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/25/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

A1

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

### AURORA SFC SYSTEMS, INC.,[1]
Respondent, Requester

v.

### WATERS TECHNOLOGIES CORPORATION,
Appellant, Patent Owner

Appeal 2014-001750
*Inter Partes* Reexamination Control 95/001,910
Patent No. US 6,561,767 B2[2]
Technology Center 3900

Before STEVEN D.A. McCARTHY, JEFFREY B. ROBERTSON and
DANIEL S. SONG, *Administrative Patent Judges.*

McCARTHY, *Administrative Patent Judge.*

## DECISION ON APPEAL

---

[1]   The Requester identifies the real party in interest as "Agilent
Technologies, Inc., successor-in-interest to Aurora SFC Systems, Inc."
("Respondents' Brief" dated August 26, 2013, at 2; "Appellant's Brief in
*Inter Partes* Reexamination" dated July 25, 2013, at 2 n.1).

[2]   Issued May 13, 2003 to Terry A. Berger; Kimber D. Fogelman; L.
Thompson Staats, III; Mark Nickerson; and Paul F. Bente, III (the "'767
patent"). The '767 patent issued from Appl. 09/918,436, filed August 1,
2001.

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1                    STATEMENT OF THE CASE

2          The Appellant/Patent Owner appeals from the Examiner's decision

3    adopting rejections of claims 1-16. Independent claims 1 and 7 were

4    amended, and new claims 13-16 were added, during the reexamination

5    proceeding. (Appellant's Brief in *Inter Partes* Reexamination dated July 25,

6    2013 ("Patent Owner's Appeal Brief" or "App. Br. PO") at 2). The Patent

7    Owner and the Requester participated in an oral argument on April 23, 2014.

8    We have jurisdiction over the Patent Owner's appeal under 35 U.S.C.

9    § 134(b) (2011) and 35 U.S.C. § 315(a) (2011).[3]

10         We sustain at least one ground of rejection against each claim on

11   appeal. On this basis, we AFFIRM. *See* 37 C.F.R. § 41.77(a) (2011).

12         The Examiner's findings and conclusions appear in the "Right of

13   Appeal Notice" mailed February 20, 2013 ("RAN").[4] The Patent Owner

14   relies on the Patent Owner's Appeal Brief and a "Rebuttal Brief" dated

15   October 25, 2013 ("Reb. Br. PO"). The Patent Owner also relies on a

16   "Declaration Pursuant to 37 C.F.R. § 1.132" executed by Dr. Lalit Chordia

17   on May 29, 2012 ("Chordia Decl."). The Requester relies on a

18   "Respondent's Brief" dated August 26, 2013 ("Resp. Br. Req'r"). The RAN

19   incorporates by reference portions of the "Request for *Inter Partes*

20   Reexamination of U.S. Patent No. 6,561,767" dated February 29, 2012

---

[3]        The Requester and the Patent Owner also are parties to a lawsuit in
*Waters Technologies Corp. v. Aurora SFC Systems, Inc.*, et al., Civil Action
No. 11-708-RGA (D. Del.). As presently advised, the lawsuit is stayed
pending the resolution of this proceeding and of Reexamination Control No.
95/001,947. (App. Br. PO 2).

[4]        The Examiner's Answer mailed September 25, 2013 incorporates the
RAN by reference.

2

A3

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    ("Request") and the "Third Party Requester's Comments to Patent Owner's

2    Response of May 29, 2012, Pursuant to 37 C.F.R. § 1.947 (and Pursuant to

3    the Notice of July 6, 2012)" dated July 13, 2012 ("Req'r Comments").

4         Only those arguments actually made by the Patent Owner have been

5    considered. Arguments that the Patent Owner could have made but chose

6    not to make have not been considered and are deemed to be waived. *See* 37

7    C.F.R. § 41.67(c)(1)(vii) (2011); *In re Jung*, 637 F.3d 1356, 1365 (Fed. Cir.

8    2011).

9

10                    THE CLAIMED SUBJECT MATTER

11        The '767 patent relates to chromatography. As described by Munk

12   '445 (US 4,032,445, issued June 28, 1977), a prior art reference cited by the

13   Requester:

14               Chromatography is a separation method wherein a
15               mixture of components (called the "sample" or
16               "sample mixture") is placed as a zone at one end of
17               a system containing a stationary phase and a
18               mobile phase. Each component of the sample
19               distributes itself in dynamic equilibrium between
20               the two phases, in a ratio characteristic of that
21               component. As a result, the flowing mobile phase
22               causes each individual component zone to migrate
23               at a characteristic rate, and the zones become
24               separated after a period of time. . . . When the
25               method is used for chemical analysis, a detector is
26               often placed at the other end of the system, so as to
27               monitor the passage of the component zones as
28               they emerge from the system.

29   (Munk '445, col. 1, ll. 10–19 and 30–33). The separation of the components

30   of the sample typically occurs in a separation column.

3

A4

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    The '767 patent discusses embodiments designed to perform

2    supercritical fluid chromatography ("SFC"). In SFC, the mobile phase is

3    composed of a mixture of two fluid streams. One fluid stream includes a

4    highly compressed gas, a compressible liquid or a supercritical fluid. The

5    other fluid stream includes a relatively incompressible liquid. The '767

6    patent suggests using a separate pump for delivering each of the two fluid

7    streams. ('767 patent, col. 1, ll. 13–15). Because the properties of the two

8    fluid streams differ, accurate flow rates are required at the pump outlets to

9    provide a reproducible mixture of fluids in the mobile phase and accurate

10    results from the chromatographic analysis. (*See, e.g.,* '767, patent, col. 1, ll.

11    7–10 and 25–34).

12    The written description portion of the '767 patent discusses the

13    behavior of reciprocating pumps for use in SFC and in high performance

14    liquid chromatography ("HPLC"):

15    A reciprocating pump has an inlet and outlet check
16    valve. During a fill stroke, the outlet check valve
17    closes, isolating the pump from the high pressure
18    in the downstream [separation] column ($P_{col}$). The
19    pressure from a filling cylinder of source fluid,
20    such as compressed $CO_2$ ($P_{cyl}$) forces open the inlet
21    check valve and fills the pump chamber. After the
22    pump is filled at $P_{cyl}$, the piston reverses direction,
23    compressing the fluid in the pump until $P_{pump} > P_{cyl}$,
24    which closes the inlet valve. On the compression
25    stroke, the piston moves rapidly until $P_{pump} > P_{col}[,]$
26    at which point the outlet valve opens and the fluid
27    moves downstream of the pump . . . . The distance
28    the piston must travel just to compress the fluid to
29    $P_{col}$ is calculated based on the known volume of
30    the components and a characteristic of the fluid
31    being pumped, called the compressibility factor Z.

4

A5

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1            With the correct Z, a pump can be controlled to
2            nearly eliminate flow or pressure ripple.

3    ('767 patent, col. 1, l. 63 – col. 2, l. 16). The Patent Owner's Declarant, Dr.

4    Lalit Chordia ("Dr. Chordia"), declares that:

5            At or near SFC conditions, the first flow stream
6            [that is, the flow stream including a highly
7            compressed gas, a compressible liquid or a
8            supercritical fluid] experiences large changes in Z
9            (i.e., compressibility factor) over small fluctuations
10          in pressure as compared to the second flow stream
11          of relatively incompressible fluid.

12   (Chordia Decl., para. 17).

13      In the case of a reciprocating pump, "compressibility compensation"

14   is a correction to the length of the piston stroke to assure the delivery of a

15   controllable flow rate despite changes in the compression of the fluid. (*See*

16   '767 patent, col. 2, ll. 31–33). To compensate for flow or pressure ripples

17   due to over-compression or under-compression of the pumped fluid, "the

18   more expensive and better liquid chromatography pumps have

19   compressibility adjustments to account for differences in fluid

20   characteristics. High-pressure SFC pumps have an extended compressibility

21   range and the ability to dynamically change the compression compensation."

22   ('767 patent, col. 2, ll. 23–29).

23      The '767 patent teaches placing a back pressure regulator just

24   downstream of the pump in an SFC system to maintain a constant pressure at

25   the pump outlet greater than either the pressure at the pump inlet or the

26   pressure at any point in the downstream gradient of the SFC system. ('767

27   patent, col. 3, ll. 58–61 and col. 5, ll. 34–37). As Dr. Chordia declares, the

28   "inventors discovered that by controlling the pressure for the first flow

5

A6

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    stream, they could limit the range of Z and thereby provide a controlled flow

2    rate in an unmodified HPLC pump." (Chordia Decl., para. 17). The '767

3    patent teaches that, "[b]ecause the pressure on the pump outlet is constant

4    due to the back-pressure regulator 30, the same compressibility

5    compensation is performed regardless of the flow. The flow may vary from

6    the pump and the speed of the pump may change, but the pressure on the

7    outlet of the pump remains constant. Therefore, a different compressibility

8    compensation scheme is not required when the flow rate changes." ('767

9    patent, col. 6, ll. 26–32).

10        Claims 1, 7 and 13 are independent method claims. Claim 1 is

11    illustrative:

12            1.    A method for converting a pump for
13        use in a combined flow stream containing a
14        mixture of highly compressed gas, compressible
15        liquid or supercritical fluid; and a relatively
16        incompressible liquid, comprising:

17            controlling pressure of a first flow stream
18        containing a highly compressed gas, compressible
19        liquid, or supercritical fluid, by maintaining an
20        elevated pressure rate after said outlet of said
21        pump but prior to joining a second flow stream of
22        a relatively incompressible liquid; and

23            pumping of said first flow stream consisting
24        of a pure fluid resulting in delivery of a
25        controllable flow rate of said first flow stream at a
26        constant compressibility compensation without the
27        need for dynamically compensating said pump for
28        compressibility changes in said first flow stream.

29    (App. Br. PO at 36 (Claims App'x)).

6

A7

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    GROUNDS OF REJECTION ADOPTED BY THE EXAMINER

2    The Patent Owner separately argues the following grounds of

3    rejection adopted by the Examiner in the RAN:

4         claims 1, 2, 5 and 6 under 35 U.S.C. § 102(b) (2011) as

5         being anticipated by Munk '018 (US 4,942,018, issued July 17,

6         1990) (see RAN 5–8; App. Br. PO 19–20);

7         claims 1 and 4–6 under §102(b) as being anticipated by

8         Allington (US 4,882,063, issued Nov. 21, 1989) (see RAN

9         16–20; App. Br. PO 23–24);

10        claims 7, 8, 11 and 13 under § 103(a) as being

11        unpatentable over Munk '445 and Klesper (E. Klesper and W.

12        Hartmann, *Apparatus and Separations in Supercritical Fluid*

13        *Chromatography*, 14 EUROPEAN POLYMER J. 77-88 (Pergamon

14        Press 1978)) (see RAN 25–30; App. Br. PO 25–27);

15        claims 7, 8, 11 and 13 under § 102(b) as being

16        anticipated by Klesper (see RAN 32–35; App. Br. PO 28–30);

17        and

18        claims 15 and 16 under § 103(a) as being unpatentable

19        over Klesper and Admitted Prior Art I appearing at column 1,

20        lines 10–13 and column 1, line 67 through column 2, line 2 of

21        the '767 patent (see RAN 38–39; Req'r Comments 41; App. Br.

22        PO 32).

23    We sustain the first three grounds of rejection.  As to these three grounds of

24    rejection, we designate the independent claims as representative. *See* 37

7

A8

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1  C.F.R. § 41.67(c)(1)(vii) (2011). We do not sustain the last two grounds of

2  rejection principally based on Klesper.

3       The Examiner also adopts the following additional grounds of

4  rejection under § 103(a):

5                 claim 3 under 35 U.S.C. §103(a) (2011) as being

6       unpatentable over Munk '018 and Bump (US 5,944,048, issued

7       Aug. 13, 1999) (*see* RAN 9);

8                 claims 4 and 14 under § 103(a) as being unpatentable

9       over Munk '018 and Admitted Prior Art II appearing at column

10      1, lines 13–20 and Figure 1 of the '767 patent (*see* RAN 9–10;

11      Request 27);

12                claims 7, 8, 10, 11 and 13 under §103(a) as being

13      unpatentable over Munk '018 and Klesper (RAN 10–13);

14                claim 9 under §103(a) as being unpatentable over Munk

15      '018, Klesper and Admitted Prior Art II (*see* RAN 13–15;

16      Request 35 ("claim 9 corresponds to claim 4"));

17                claim 12 under §103(a) as being unpatentable over Munk

18      '018, Klesper and Bump (*see* RAN 16);

19                claims 15 and 16 under §103(a) as being unpatentable

20      over Munk '018, Klesper and Admitted Prior Art I (*see* RAN

21      13–15; Req'r Comments 42);

22                claims 7–9, 11 and 13 under § 103(a) as being

23      unpatentable over Allington , Klesper and Admitted Prior Art

24      III appearing at column 1, lines 47–52 and column 7, lines

25      5–10 of the '767 patent (*see* RAN 20-24; Request 50);

8

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1      claim 12 under § 103(a) as being unpatentable over

2      Allington, Klesper, Admitted Prior Art III and Bump (*see* RAN

3      25);

4          claims 15 and 16 under § 103(a) as being unpatentable

5      over Allington, Klesper and Admitted Prior Art III (*see* RAN

6      20–24; Req'r Comments 43);

7          claims 15 and 16 under § 103(a) as being unpatentable

8      over Munk '445, Klesper and Admitted Prior Art I (*see* RAN

9      30–32; Req'r Comments 44);

10         claims 7, 9 and 13 under § 103(a) as being unpatentable

11     over Klesper (*see* RAN 35–37); and

12         claim 12 under § 103(a) as being unpatentable over

13     Klesper and Bump (*see* RAN 37).

14   The Patent Owner argues only that the secondary references cited in these

15   grounds of rejection fail to remedy deficiencies in the primary references as

16   applied to the independent claims from which the rejected claims ultimately

17   depend. (*See* App. Br. 20–31). We sustain the first ten of these grounds of

18   rejection. We do not sustain the last two grounds of rejection principally

19   based on Klesper.

20       The Examiner rejects new claims 13 and 16 under 35 U.S.C. § 314(a)

21   (2011) as enlarging the scope of the claims of the '767 patent. (RAN 39).

22   Because we sustain grounds of rejection of each claim on appeal under

23   § 102(b) or § 103(a), we need not reach this ground of rejection. *See* 37

24   C.F.R. § 41.77(a).

9

A10

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1                              ISSUE

2          "Both anticipation under § 102 and obviousness under § 103 are two-

3    step inquiries. The first step in both analyses is a proper construction of the

4    claims. . . . The second step in the analyses requires a comparison of the

5    properly construed claim to the prior art." *Medichem, S.A. v. Rolabo, S.L.*,

6    353 F.3d 928, 933 (Fed. Cir. 2003) (internal citations omitted). Anticipating

7    or primary references Munk '018, Allington and Munk '445 describe

8    chromatography systems using syringe pumps for pumping a flow stream

9    containing a highly compressed gas, compressible liquid, or supercritical

10   fluid against a constant, elevated pressure. (*See* Munk '018, col. 2, ll. 1–19;

11   Allington, col. 3, l. 66 – col. 4, l. 3; Munk '445, col. 2, ll. 9–19). The

12   primary issue in this appeal turns on whether the step of "pumping of [a]

13   first flow stream . . . resulting in delivery of a controllable flow rate of said

14   first flow stream at a constant compressibility compensation without the

15   need for dynamically compensating said pump for compressibility changes

16   in said first flow stream" is sufficiently broad to encompass pumping of the

17   first flow stream against an elevated pressure using a syringe pump lacking a

18   compressibility compensation adjustment mechanism. (*See, e.g.*, App. Br.

19   PO 6–17; Reb. Br. PO 2–11).

20

21                       CLAIM INTERPRETATION

22   The Examiner correctly concludes that:

23                 The [P]atent [O]wner's arguments that the prior art
24                 pump    lacks    a    [constant    compressibility
25                 compensation] "adjustment mechanism" capable
26                 of compensating for a known Z (compressibility)
27                 factor is inconsistent with the ['767] patent's

                               10

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1                 disclosure, which teaches that the invention is
2                 specifically designed to avoid the use of pumps
3                 with variable compression adjustment mechanisms
4                 and also teaches that knowledge of the Z factor is
5                 not required to implement the invention, i.e., the
6                 patent's disclosure and claims do not require an
7                 "adjustment mechanism" capable of compensating
8                 for a known Z factor but rather define the claimed
9                 pump as not including an "adjustment
10                mechanism."

11 (RAN 6, citing Req'r Comments 2–15 and 23–24). The Examiner also

12 correctly concludes that the disclosure of the '767 patent "states that the

13 pump can run with no compressibility compensation and, therefore, the

14 disclosure qualifies a syringe pump, i.e., a pump without compression

15 compensation, as a pump suitable for use in the claimed process which

16 results in operation under [constant compressibility compensation]." (RAN

17 5–6).

18       Claims under reexamination are to be given their broadest reasonable

19 interpretation. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

20 Two canons of claim construction lay out the general relationship between

21 the claims and the written description of a patent: "(a) one may not read a

22 limitation into a claim from the written description, but (b) one may look to

23 the written description to define a term already in a claim limitation, for a

24 claim must be read on view of the specification of which it is a part."

25 *Renishaw PLC v. Marposs SpA*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

26 Extrinsic evidence, such as the declarations of experts, should not be used to

27 introduce limitations into a claim beyond those limitations required by the

11

A12

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    claim language read in the context of the specification. *See Phillips v. AWH*

2    *Corp.*, 415 F.3d 1303, 1318–19 (Fed. Cir. 2005)(en banc).

3        Each independent claims recites the step of "pumping of said first

4    flow stream . . . resulting in delivery of a controllable flow rate of said first

5    flow stream *at a constant compressibility compensation without the need for*

6    *dynamically compensating said pump for compressibility changes in said*

7    *first flow stream*." (Italics added for emphasis.) The claim language itself

8    permits two observations to be made. First, the claim language contrasts

9    "delivery of a controllable flow rate of said first flow stream at a constant

10    compressibility compensation" with a "need for dynamically compensating

11    said pump for compressibility changes in said first flow stream." This

12    contrast implies that delivery "at constant compressibility compensation"

13    does not require a dynamic compressibility compensation adjustment

14    mechanism. Second, the claim language identifies "delivery of a

15    controllable flow rate of said first flow stream at a constant compressibility

16    compensation" as resulting from the pumping of the fluid, either against a

17    back pressure as recited in claims 7 and 13, or in the presence of a back

18    pressure maintained in a previous method step upstream of the pump outlet

19    as recited in claim 1.

20        At least in the case of a reciprocating pump, "compressibility

21    compensation" is a correction to the length of the piston stroke to assure the

22    delivery of a controllable flow rate despite changes in the compression of the

23    fluid. (*See* '767 patent, col. 2, ll. 31–33). This correction is calculated based

24    on the known volume of the fluid component in the pump and the

25    compressibility factor $Z$ of the component. (*See* '767 patent, col. 2, ll.

12

A13

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    10–14). The effect of maintaining an elevated back pressure at the pump

2    outlet is to limit the range of values of the compressibility factor $Z$,

3    potentially limiting it to a constant value. (*See* Chordia Decl., para. 17).

4    This is particularly true where pump inlet pressure and fluid temperature

5    also are controlled. (*See* '767 patent, col. 4, ll. 1–3). If the compressibility

6    factor is held constant or substantially constant by the back pressure at the

7    pump outlet, any correction to the stroke will depend on the known volume

8    of the fluid component alone. In the Examiner's words, the delivery of a

9    controllable flow rate at constant compressibility compensation "is merely

10   the result of placing a back pressure regulator downstream of a pump to

11   create an unchanging compression." (RAN 6). A variable compressibility

12   compensation adjustment device will deliver a controllable flow rate at a

13   constant compressibility compensation because the compressibility factor

14   will be substantially constant.

15       By way of background, "[s]yringe-type pumps generally consist of a

16   cylinder that holds the mobile phase [or a component of the mobile phase]

17   which is expelled by a piston." Y. Kazekevich, HPLC_Book, https://hplc

18   .chem.shu.edu/NEW/HPLC_Book/Instrumentation/pmp_syrg.html (last

19   visited September 22, 2014). A syringe pump acting against a constant,

20   elevated back pressure will perform the step of pumping a flow stream

21   substantially identically to a reciprocal pump having a compressibility

22   compensation adjustment mechanism acting against a constant, elevated

23   back pressure. In both cases, the compression of the fluid in the pump will

24   be set by the back pressure. The stroke length of the piston pumping the

25   flow stream will not change due to changes in the compression, because

13

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    there will be no changes in the compression. In other words, the use of a

2    syringe pump to pump the first flow stream either against a back pressure as

3    recited in claims 7 and 13; or in the presence of a back pressure maintained

4    in a previous method step upstream of the pump outlet as recited in claim 1,

5    will result in "delivery of a controllable flow rate of said first flow stream at

6    a constant compressibility compensation."

7        The testimony of the Patent Owner's Declarant, Dr. Chordia, is not

8    persuasive that the phrase "at constant compressibility compensation" had a

9    different ordinary or customary meaning in the pertinent art. Dr. Chordia's

10   description of the claimed subject matter addresses only the avoidance of

11   dynamic compressibility compensation. (*See, e.g.*, Chordia Decl., paras. 16

12   and 17). The testimony that syringe pumps are not designed to be capable of

13   providing "constant compressibility compensation" because syringe pumps

14   "do not have reciprocating check valves nor the software/hardware needed

15   to compress fluid based on a known volume of components and $Z$" (Chordia

16   Decl., para. 22–24; *see also id.*, paras. 19, 20, 23 and 24) appears to conflate

17   "constant compressibility compensation" with dynamic compressibility

18   compensation, in which changes in the compressibility factor $Z$ require

19   recalculation of the stroke length in order to control the flow rate.[5] Nowhere

20   does Dr. Chordia provide any citation to any evidence which might

---

[5]    Likewise, Dr. Chordia's testimony that the syringe pump described in
Allington "cannot be changed based on a compressibility factor $Z$" (Chordia
Decl., para. 27) appears to address whether the syringe pump is capable of
dynamic compressibility compensation rather whether the use of the pump
to pump a flow stream against an elevated pressure would result in delivery
of a controllable flow at constant compressibility compensation.

14

A15

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1   demonstrate a specialized meaning inconsistent with the Examiner's

2   interpretation.

3       The interpretation of the phrase "at constant compressibility

4   compensation" as encompassing pumps lacking compressibility

5   compensation adjustment mechanisms is consistent with the Specification.

6   For example, the '767 patent teaches that "*[t]he present invention* does not

7   require knowledge of the compressibility constant;" that the "pump can run

8   at different flowrates in an open loop *with no compressibility*

9   *compensation*;" and that "*[t]he present invention* does not require the

10  calculation of how far to move the pumping pistons or how far to move the

11  intake strokes." ('767 patent, col. 5, l. 66 – col. 6, l. 13 (italics added for

12  emphasis)). Each of these passages implies that the pumping step of the

13  "present invention" (that is, the pumping step recited in claims 1, 7 and 13)

14  may be performed by a pump lacking a compressibility compensation

15  adjustment mechanism and without any ability to calculate a dynamic

16  adjustment to the manner in which the first flow stream is pumped based on

17  the compressibility factor $Z$.

18      The '767 patent also teaches that:

19          An exemplary embodiment of the present
20          invention could use a relatively inexpensive pump
21          to deliver reproducible and controllable flow,
22          without the close monitoring and adjustment
23          typically required for SFC.   Various types of
24          pumps are also capable of delivering the flow,
25          such as reciprocating, duel-piston, diaphragm and
26          screw pumps.

27  ('767 patent, col. 6, ll. 20-25). Reciprocating pumps are but one type of

28  pump mentioned as being suitable for the invention. The Requester

15

A16

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1 correctly points out (*see* Resp. Br. Req'r 8 and 12), and the Patent Owner

2 does not appear to deny, that at least diaphragm pumps and screw pumps

3 lack compressibility compensation adjustment mechanisms. Once again,

4 this passage implies that the independent claims of the '767 patent are

5 sufficiently broad to encompass pumping of a first flow stream by means of

6 a pump lacking a compressibility compensation adjustment mechanism.[6]

7     The Patent Owner argues that the Examiner's interpretation of the

8 phrase "delivery of a controllable flow rate of said first flow stream at a

9 constant compressibility compensation" as used in claims 1, 7 and 13 results

10 from a misunderstanding of the problem addressed by the claimed subject

11 matter. (*See* App. Br. PO 8). The '767 patent identifies the problem

12 addressed by the "present invention" as being "how to accomplish accurate

13 composition of the flow stream [that is, the mobile phase] and steady flow

14 rates while avoiding variable compression compensation adjustments to a

15 flow pump that is delivering a highly compressible fluid, such as carbon

16 dioxide, to a supercritical fluid chromatography class of system." ('767

17 patent, col. 3, ll. 21-26; *see also id.*, Abstract). The patent also teaches that

18 the "result of the invention is controllable flow of a compressible fluid

19 delivered downstream of the [back-pressure] regulator to the mobile phase

20 and into the SFC column without performing dynamic compression

21 compensation or other types of compensations for leaks and ripples in flow

22 on the pump." ('767 patent, col. 3, ll. 37-42). Although each passage speaks

---

[6]     The Patent Owner argues on page 13 of the Appeal Brief that, "if one tried to pump a density controlled flow stream of a compressible fluid, such as $CO_2$, with a pump that has no compressibility compensation, a controllable flow could not be achieved." This argument is belied by the teaching reproduced above from column 6, lines 20-25, of the '767 patent.

16

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    of avoiding a need for variable or dynamic compressibility compensation,

2    neither passage expresses a need for a compressibility compensation

3    adjustment mechanism of any sort.  The Patent Owner has not shown that

4    the Examiner's interpretation of claims 1, 7 and 13 reflects a

5    misunderstanding of the problem addressed by the claimed subject matter.

6         The one mention of "constant compressibility compensation" in the

7    '767 patent outside the claims appears at column 3, lines 17-20.  The usage

8    does not contradict the conclusion that the phrase "at constant

9    compressibility compensation" encompasses pumps having limited or no

10   capacity for compressibility compensation and no ability to dynamically

11   compensate for compressibility changes.  More specifically, the usage does

12   not exclude converting a pump having no compressibility compensation

13   adjustment mechanism for use in gradient elution SFC.  Likewise, the '767

14   patent teaches that the "method of the present invention permits unmodified

15   HPLC pumps to deliver accurate flow composition under isocratic

16   conditions, despite having limited compressibility compensation ranges and

17   no ability to dynamically compensate for compressibility changes." ('767

18   patent, col. 5, ll. 11-15).  This teaching does not exclude the possibility that

19   the "method of the present invention" might also permit diaphragm pumps

20   or screw pumps as described in column 6, lines 23-25, of the '767 patent, as

21   well as other pumps lacking compressibility compensation adjustment

22   mechanisms to deliver accurate flow composition.  Despite the Patent

23   Owner's argument that these passages imply claims 1, 7 and 13 are limited

24   to pumping using pumps having compressibility compensation adjustment

25   mechanisms (see, e.g., App. Br. PO 8; Reply Br. PO 5-6 and 9-10), the

26   language of the claims is broad.

17

A18

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    The Examiner, the Requester and the Patent Owner appear to agree, at

2    least for purposes of this appeal, that a syringe pump has no compressibility

3    compensation adjustment mechanism.  Nevertheless, the use of a syringe

4    pump to pump a first flow stream either against a back pressure as recited in

5    claims 7 and 13; or in the presence of a back pressure maintained in a

6    previous method step upstream of the pump outlet as recited in claim 1, will

7    result in "delivery of a controllable flow rate of said first flow stream at a

8    constant compressibility compensation without the need for dynamically

9    compensating said pump for compressibility changes in said first flow

10   stream."

11

12                COMPARISON OF THE PRIOR ART TO THE CLAIMED SUBJECT
13                                        MATTER

14   *Rejections of claims 1, 2, 5 and 6 under § 102(b) as being anticipated by*
15   *Munk '018; claim 3 under §103(a) as being unpatentable over Munk '018*
16   *and Bump; claims 4 and 14 under § 103(a) as being unpatentable over*
17   *Munk '018 and Admitted Prior Art II; claims 7, 8, 10, 11 and 13 under*
18   *§103(a) as being unpatentable over Munk '018 and Klesper; claim 9 under*
19   *§103(a) as being unpatentable over Munk '018, Klesper and Admitted Prior*
20   *Art II; claim 12 under §103(a) as being unpatentable over Munk '018,*
21   *Klesper and Bump; and claims 15 and 16 under §103(a) as being*
22   *unpatentable over Munk '018, Klesper and Admitted Prior Art I*

23   *Rejections of claims 1 and 4–6 under §102(b) as being anticipated by*
24   *Allington; claims 7–9, 11 and 13 under § 103(a) as being unpatentable over*
25   *Allington , Klesper and Admitted Prior Art III; claim 12 under § 103(a) as*
26   *being unpatentable over Allington, Klesper, Admitted Prior Art III and*
27   *Bump; and claims 15 and 16 under § 103(a) as being unpatentable over*
28   *Allington, Klesper and Admitted Prior Art III*

29   *Rejections of claims 7, 8, 11 and 13 under § 103(a) as being unpatentable*
30   *over Munk '445 and Klesper; and claims 15 and 16 under § 103(a) as being*
31   *unpatentable over Munk '445, Klesper and Admitted Prior Art I*

18

A19

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    The Examiner rejects independent claim 1 under § 102(b) as being

2    anticipated by Munk '018. (*See* RAN 5; Request 18–22). Munk '018

3    describes a chromatography system using a mobile phase formed by mixing

4    flow streams from two or more syringe pumps. Munk '018 teaches

5    attenuating an oscillating mode resulting from differences in the viscosity

6    and compressibility of the two flow streams by placing individual back

7    pressure regulating valves at the outlet of each syringe pump. (*See* Munk

8    '018, col. 2, ll. 1–19).

9    The Examiner also rejects independent claim 1 under § 102(b) as

10    being anticipated by Allington. (*See* RAN 16–20; Request 37-41).

11    Allington describes a chromatographic system *10* including first and second

12    single-stroke syringe pumps *16, 18*. (Allington, col. 3, l. 66 – col. 4, l. 3).[7]

13    The first and second syringe pumps *16, 18* pump first and second flow

14    streams against back pressure applied by a spring-loaded poppet *80* and an

15    O-ring *84*. (Allington, col. 6, ll. 40–62 and col. 16, ll. 63–67). The Patent

16    Owner's sole argument is that Allington does not anticipate claim 1 because

17    Allington, like Munk '018, describes the use of syringe pumps; and the

18    Examiner, the Requester and the Patent Owner agree that syringe pumps do

19    not have compressibility compensation adjustment mechanisms.

20    The Examiner additionally rejects independent claims 7 and 13 under

21    § 103(a) as being unpatentable over Munk '445 and Klesper. (*See* RAN

---

[7]    We address Allington's pumps *16, 18* as they have been characterized
by the parties in their briefs. Nevertheless, we note that Allington teaches
replacing the syringe pumps with reciprocating pumps for SFC operation.
(*See* Allington, col. 10, ll. 42-46; Lefferson (US 3,985,467, issued Oct. 12,
1976) at col. 1, ll. 61-62).

19

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1   25–30). Claim 7 recites a method including the step of "pumping of [a] first

2   flow stream . . . against an elevated pressure rate resulting in delivery of a

3   controllable flow rate of said first flow stream at a constant compressibility

4   compensation without the need for dynamically compensating said pump for

5   compressibility changes in said first flow stream." (App. Br. PO 37 (Claims

6   App'x)). Munk '445 describes a liquid chromatographic system *10*

7   including first and second reservoirs *12, 14* containing different solvents *16,*

8   *18* as well as first and second pistons *20, 22* for displacing the solvents *16,*

9   *18* in the reservoirs *12, 14.* (Munk '445, col. 4, ll. 32–42). This description

10   is consistent with the use of syringe pumps for pumping the solvents *16, 18.*[8]

11   Munk '445 teaches incorporating a manually operated back pressure

12   regulating valve *50* into the system *10* to address problems deriving from

13   failure to account for the differing compressibilities of the solvents. (*See*

14   Munk '445, col. 6, ll. 60-63; *see also id*, col. 2, ll. 20-38 and col. 4, l. 67 –

15   col. 5, l. 1).

16        The Patent Owner's sole argument with respect to each of these

17   grounds of rejection is that Munk '018; Allington; and Munk '445 teach the

18   use of syringe pumps; the Examiner, the Requester and the Patent Owner

19   agree that syringe pumps do not have compressibility compensation

20   adjustment mechanisms; and, in the rejection of claims 7 and 13 under

---

[8]      The Examiner and the Requester appear to characterize the pumps as
syringe pumps for purposes of this appeal. (*See, e.g.*, RAN 25–28).
Nevertheless, we note that the Requester characterized the pumps as
reciprocating pumps in the Request based on the recitations of claim 5 of
Munk '445. (*See* Request 57, citing Munk '445, col. 9, ll. 3-6).

20

A21

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1   § 103(a), that this constitutes a deficiency in the teachings of Munk '445

2   which Klesper fails to remedy. (*See* App. Br. 19–20, 23–24 and 25–27).

3   Nevertheless, for the reasons discussed above, syringe pumps are capable of

4   "pumping of [a] first flow stream . . . against [a constant,] elevated pressure

5   rate resulting in delivery of a controllable flow rate of said first flow stream

6   at a constant compressibility compensation without the need for dynamically

7   compensating said pump for compressibility changes in said first flow

8   stream." Therefore, seeing no deficiency in the disclosures of Munk '018,

9   Allington and Munk '445, we sustain the rejection of claims 1, 2, 5 and 6

10  under § 102(b) as being anticipated by Munk '018; the rejection of claims 1

11  and 4–6 under §102(b) as being anticipated by Allington; and the rejection

12  of claims 7, 8, 11 and 13 under § 103(a) as being unpatentable over Munk

13  '445 and Klesper.

14         The Patent Owner argues the rejections under §103(a) of claim 3 as

15  being unpatentable over Munk '018 and Bump; claims 4 and 14 as being

16  unpatentable over Munk '018 and Admitted Prior Art II; claims 7, 8, 10, 11

17  and 13 as being unpatentable over Munk '018 and Klesper; and claim 9 as

18  being unpatentable over Munk '018, Klesper and Admitted Prior Art II,

19  solely on the basis that the teachings of the secondary references fail to

20  remedy deficiencies in the teachings of Munk '018 as applied to claim 1.

21  (*See* App. Br. PO 20–22). The Patent Owner likewise argues the rejections

22  under § 103(a) of claims 7–9, 11 and 13 as being unpatentable over

23  Allington, Klesper and Admitted Prior Art III; claim 12 as being

24  unpatentable over Allington, Klesper, Admitted Prior Art III and Bump; and

25  claims 15 and 16 as being unpatentable over Allington, Klesper and

21

A22

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1   Admitted Prior Art III, solely on the basis that the teachings of the secondary

2   references fail to remedy deficiencies in the teachings of Allington as

3   applied to claim 1. (*See* App. Br. PO 24–25). The Patent Owner argues the

4   rejection of claims 15 and 16 under § 103(a) as being unpatentable over

5   Munk '445, Klesper and Admitted Prior Art I solely on the basis that the

6   teachings of the secondary references fail to remedy deficiencies in the

7   teachings of Munk '018 as applied to claim 1. (*See* App. Br. PO 27–28).

8   Seeing no such deficiencies, we sustain these grounds of rejection.

9

10  *Rejection of claims 7, 8, 11 and 13 under § 102(b) as being anticipated by*
11  *Klesper*

12          The Examiner rejects independent claims 7 and 13 under

13  § 102(b) as being anticipated by Klesper (*see* RAN 32–35). Klesper

14  describes a chromatography system having two solvent supply systems *1*.

15  Each of the two solvents is fed through a double-headed membrane pump *2*.

16  (Klesper 78). Figure 1 of page 78 of Klesper depicts a second, single-

17  headed membrane pump *17* connected in parallel with one head of the

18  double headed membrane pump *2* to raise the pressure up to 3000 bars.

19  Page 100 of the Request argues that "Klesper teaches that a second pump in

20  the compressible or supercritical fluid flow stream . . . can elevate the

21  pressure in the flow stream prior to mixing with a second relatively

22  incompressible solvent flow stream." In other words, the Request appears to

23  argue that the second pump maintains an elevated pressure at the outlet of

24  the double-headed membrane pump so that the pumping of a flowstream by

25  one head of the double-headed membrane pump results in "*delivery of a*

26  *controllable flow rate of said first flow stream* at a constant compressibility

22

A23

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1  compensation without the need for dynamically compensating said pump for

2  compressibility changes in said first flow stream." The Examiner

3  incorporates this argument by reference into the RAN. (*See* RAN 32).

4      Dr. Chordia declares that "Klesper fails to teach or disclose any

5  control over either [solvent flow] stream. We know the methods fail to

6  provide controlled flow rates, because a dampening [*sic*] coil is required to

7  remove turbulence in the mixed n-pentane stream." (Chordia Decl., para.

8  28, citing Klesper 78). This testimony is uncontested and persuasive. (*See*

9  *generally* Resp. Br. Req'r 23-24). The arguments of counsel appearing at

10  page 38 of the Comments are not supported by persuasive evidence. We do

11  not sustain the rejection of claims 7, 8, 11 and 13 under § 102(b) as being

12  anticipated by Klesper.

13

14  *Rejections of claims 15 and 16 under § 103(a) as being unpatentable over*
15  *Klesper and Admitted Prior Art I; claims 7, 9 and 13 under § 103(a) as*
16  *being unpatentable over Klesper; and claim 12 under § 103(a) as being*
17  *unpatentable over Klesper and Bump*

18      The Examiner also rejects independent claims 7 and 13 under § 103(a)

19  as being unpatentable over Klesper. Klesper's chromatographic apparatus

20  includes an oven *3* downstream of the mixing of the two solvent flow

21  streams for heating the mobile phase to supercritical temperature. The oven

22  includes a buffering coil *h* "to act as a buffering volume for smoothing the

23  pressure fluctuations of the pumps." (Klesper 78). A metering valve *c*

24  controlled by an electric feedback loop *12* lies immediately downstream of

25  the buffering coil *h*. The combination of the buffering coil *h*, the metering

26  valve *c* and the electronic feedback loop *12* maintains a constant back

27  pressure. Klesper teaches that the combination of the buffering coil *h* and

23

A24

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1    the metering valve $c$ "usually suffices already at room temperature for

2    depulsification without taking recourse to the more easily compressible

3    supercritical state." (*Id.*)

4        The Requester argues that it would have been obvious to move the

5    buffering coil $h$ and the metering valve $c$ upstream of the mixing of the two

6    solvent flow streams, either as a matter of "design variation" (that is, design

7    choice) or as a predictable use of a known technique for improving a similar

8    chromatography apparatus. (Request 101–02; Req'r Comments 39-40).

9    The Examiner incorporates this argument by reference into the RAN. (*See*

10   RAN 35).

11       Dr. Chordia declares that the "location of the damping coil in

12   Klesper's apparatus is important to Klesper's proper operation. If the

13   damping coil is moved to a location upstream of mixing, on one of the two

14   flow streams, it would not provide depulsification of the combined flow

15   streams as required." (Chordia Decl., para. 29, citing Klesper 78). This

16   testimony is uncontested and persuasive. In view of Dr. Chordia's

17   testimony, the proposed positioning of the buffering coil $h$ and the metering

18   valve $c$ upstream of the mixing of the two solvent flow streams would not

19   have been be a matter of mere "design variation." Neither has the Examiner

20   or the Requester shown that the positioning of the buffering coil $h$ and the

21   metering valve $c$ upstream of the mixing of the two solvent flow streams was

22   a *known* technique for *improving* a chromatography apparatus. We do not

23   sustain the rejection of claims 7, 9 and 13 under § 103(a) as being

24   unpatentable over Klesper.

25       With regard to the rejection of claim 12 under § 103(a) as being

26   unpatentable over Klesper and Bump, the Requester appears to cite Bump as

24

A25

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

1   teaching the step of determining the mass flow rate of a flow stream by

2   means of a mass flow instrument. (*See* Request 94 (discussing a proposed

3   but non-adopted rejection of claim 3)). With regard to the rejection of

4   claims 15 and 16 under § 103(a) as being unpatentable over Klesper and

5   Admitted Prior Art I, the Requester appears to cite Admitted Prior Art I to

6   show the application of a chromatography system to SFC. (*See* Req'r

7   Comments 41). In neither case do the cited teachings of the secondary

8   reference remedy the deficiencies in the teachings of Klesper as applied to

9   parent claim 7 or 13. We do not sustain these rejections, either.

10

11                              DECISION

12        We AFFIRM the Examiner's decision rejecting claims 1-16.

13        Requests for extensions of time in this *inter partes* reexamination

14   proceeding are governed by 37 C.F.R. § 1.956 (2011).

15        In the event neither party files a request for rehearing within the time

16   provided in 37 C.F.R. § 41.79, and this decision becomes final and

17   appealable under 37 C.F.R. § 41.81, a party seeking judicial review must

18   timely serve notice on the Director of the United States Patent and

19   Trademark Office. See 37 C.F.R. §§ 90.1 and 1.983.

20

21                              AFFIRMED

22

25

A26

Appeal 2014-001750
Reexamination Control 95/001,910
Patent US 6,561,767 B2

ack
Patent Owner:

MCCARTER & ENGLISH LLP / WATERS
265 FRANKLIN STREET
BOSTON, MA 02110

Third Party Requester:

LIEBERMAN & BRANDSDORFER, LLC
802 STILL CREEK LANE
GAITHERSBURG, MD 20878

A27

US006561767B2

## (12) United States Patent
### Berger et al.

(10) Patent No.: **US 6,561,767 B2**
(45) Date of Patent: **May 13, 2003**

(54) **CONVERTING A PUMP FOR USE IN SUPERCRITICAL FLUID CHROMATOGRAPHY**

(75) Inventors: **Terry A. Berger**, Newark, DE (US); **Kimber D. Fogelman**, Hockessin, DE (US); **L. Thompson Staats, III**, Lincoln University, PA (US); **Mark Nickerson**, Landenburg, PA (US); **Paul F. Bente, III**, Landenburg, PA (US)

(73) Assignee: **Berger Instruments, Inc.**, Newark, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/918,436**

(22) Filed: **Aug. 1, 2001**

(65) **Prior Publication Data**

US 2003/0026704 A1 Feb. 6, 2003

(51) Int. Cl.[7] .......................... **F04B 19/24; F04B 23/00; F04B 49/00**

(52) U.S. Cl. .......................... **417/53;** 417/313; 417/279

(58) Field of Search .......................... 417/53, 313, 279; 73/19.02

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,373,864 A * 2/1983 Massey et al. .............. 417/213
5,089,124 A * 2/1992 Mahar et al. ............... 210/101
5,281,406 A * 1/1994 Stalling et al. ......... 423/455 B
5,305,232 A * 4/1994 Chimowitz et al. ......... 210/386

OTHER PUBLICATIONS

"chromatography" Encyclopedia Britannica <http:www.search.eb.com/eb/article?eu=119265>.*

* cited by examiner

*Primary Examiner*—Charles G. Freay
*Assistant Examiner*—Timothy P. Solak
(74) *Attorney, Agent, or Firm*—ZITO tlp; Joseph J. Zito; Kendal M. Sheets

(57) **ABSTRACT**

A method for converting a pump for use in a flow stream containing a mixture of highly compressed gas, compressible liquid or supercritical fluid wherein the pump delivers a compressible fluid against a back-pressure regulator which in turn delivers a controllable flow rate downstream of the regulator without performing variable compressibility compensation adjustments on the pump. By using a pressurized source of compressible fluid combined with isocratic conditions, the delivery pressure from the pump is controlled at a rate higher than the downstream gradient with the back-pressure regulator, and an inexpensive pump may be used in place of specialized, expensive pumps and compressibility compensation systems for use in stems operating at or near supercritical fluid levels of compressible fluids. Significant capital and operating laboratory costs are saved through a simpler and cheaper system for accurately delivering compressible fluids into mobile phase flow streams.

**12 Claims, 2 Drawing Sheets**





FIGURE 1
(PRIOR ART)



FIGURE 2

US 6,561,767 B2

**1**

## CONVERTING A PUMP FOR USE IN SUPERCRITICAL FLUID CHROMATOGRAPHY

### BACKGROUND OF THE INVENTION

Pumps used in SFC Supercritical Fluid Chromatography control the mass-flow of each component of the mobile phase, and therefore control the composition of the mobile phase through the column. Pumping compressible fluids, such as carbon dioxide (CO2), at high pressures in SFC systems while accurately controlling the flow, is more difficult than that for a liquid chromatography system. SFC systems use two pumps to deliver two different source streams into a single mobile phase flow stream. Each pump on each flow stream adds pressure, flow ripples, and variances that cause baseline noise. The two pumps also operate at different frequencies, different flow rates, and require separate compressibility compensations, further adding to the complexity of flow operations.

Pumps used for supercritical fluid chromatography typically require an extended compressibility compensation range plus a dynamically variable compressibility compensation range to accurately deliver a desired flow rate and fluid composition. When a compressible fluid is mixed with an incompressible fluid, the viscosity of the mixture depends on the mole fraction of the modifier, or incompressible fluid, in the compressible fluid. In combi-chem analysis and purification by SFC, the concentration of modifier can be varied from 2.5 to 55% over a few minutes. This can result in a major change in the viscosity of the fluid and in the pressure drop across a chromatographic column that can change over an order of magnitude from approximately 9 bar to greater than 250 bar.

Normally, an unmodified high performance liquid chromatography (HPLC) pump would deliver an unknown and varying amount of a compressible fluid under such conditions. As the column head pressure increases during the gradient, a larger percentage of each pump stroke would be used up compressing the fluid instead of delivering flow. With an uncompensated pump, the delivery rate becomes a smaller fraction of the flow setpoint. When a second pump is added to a system to deliver an incompressible fluid under high pressure, its delivery rate is unaffected by the increasing pressure. Subsequently the two pumps deliver inaccurate flow and composition to the mobile phase. As the pressure in the system rises, the total flow drops below its setpoint, but the concentration of the modifier increases beyond the modifier setpoint. The temperature of the compressible fluid in the pump head must be controlled to prevent the delivered mass flow from changing even further.

When compressed, a pumping fluid heats up and attempts to expand. For highly compressible carbon dioxide at outlet pump pressures above 200 bar, temperature rise of more than ten degrees centigrade are possible within the fluid. The rapid compression of the pumping fluid causes the fluid to heat up and expand and the density to decrease. When heat is transferred to the pump body, the pumped fluid cools and the fluid density increases.

Reciprocating pumps are typically used in HPLC and SFC. These pumps are more accurate than syringe pumps and can deliver essentially an infinite volume before refilling. A reciprocating pump has an inlet and outlet check valve. During a fill stroke, the outlet check valve closes, isolating the pump from the high pressure in the downstream column ($P_{col}$). The pressure from a filling cylinder of source

**2**

fluid, such as compressed CO2, ($P_{cyl}$) forces open the inlet check valve and fills the pump chamber. After the pump is filled at $P_{cyl}$, the piston reverses direction, compressing the fluid in the pump until $P_{pump} > P_{cyl}$, which closes the inlet valve. On the compression stroke, the piston moves rapidly until $P_{pump} > P_{col}$ at which point the outlet valve opens and the fluid moves downstream of the pump and into the column. The piston slows down to the delivery speed when enough extra fluid has been pushed into the column to compensate for lack of flow during the fill stroke. The distance the piston must travel just to compress the fluid to $P_{col}$ is calculated based on the known volume of the components and a characteristic of the fluid being pumped, called the compressibility factor Z. With the correct Z, a pump can be controlled to nearly eliminate flow or pressure ripple.

Without a correct Z, the pump either under- or over-compresses the fluid causing characteristic ripples in flow and pressure. Either under- or over-compression results in periodic variation in both pressure and flow with the characteristic frequency of the pump (ml/min divided by pump stroke volume in ml). The result is noisy baselines and irreproducibility. To compensate for this, the more expensive and better liquid chromatography pumps have compressibility adjustments to account for differences in fluid characteristics.

High-pressure SFC pumps have an extended compressibility range and the ability to dynamically change the compression compensation. While these pumps are used as flow sources and the pressure and temperature of the delivered fluid may be measured. The pumps can change the length of compression to account for changes in compressibility with pressure and temperature. Methods in the prior art calculate ideal compressibility based on measured temperature and pressure using a sophisticated equation of state. The method then uses dithering around the setpoint to see if a superior empirical value can be found. This approach is described in U.S. Pat. No. 5,108,264, Method and Apparatus for Real Time Compensation of Fluid Compressibility in High Pressure Reciprocating Pumps, and U.S. Pat. No. 4,883,409, Pumping Apparatus for Delivering Liquid at High Pressure. Other prior art methods move the pump head until the pressure in the refilling cylinder is nearly the same as the pressure in the delivering pump head. One method in U.S. Pat. No. 5,108,264 Method and Apparatus for Real Time Compensation of Fluid Compressibility in High Pressure Reciprocating Pumps, adjusts the pumping speed of a reciprocating pump by delivering the pumping fluid at high pressure and desired flow rate to overcome flow fluctuations. These are completely empirical forms of compressibility compensation. The prior art methods require control of the fluid temperature and are somewhat limited since they do not completely compensate for the compressibility. The compensation stops several hundred psi from the column inlet pressure.

The compressibility of the pumping fluid directly effects volumetric flow rate and mass flow rate. These effects are much more noticeable when using compressible fluids such as carbon dioxide in SFC rather than fluids in liquid chromatography. The assumption of a constant compressibility leads to optimal minimization of fluid fluctuation at only one point of the pressure/temperature characteristic, but at other pressures and temperatures, flow fluctuations occur in the system.

If the flow rate should be kept as constant as possible through the separation column. If the flow rate fluctuates, variations in the retention time of the injected sample would

A34

US 6,561,767 B2

**3**

occur such that the areas of the chromatographic peaks produced by a detector connected to the outlet of the column would vary. Since the peak areas are representative for the concentration of the chromatographically separated sample substance, fluctuations in the flow rate would impair the accuracy and the reproducibility of quantitative measurements. At high pressures, compressibility of solvents is very noticeable and failure to account for compressibility causes technical errors in analyses and separation in SFC.

## SUMMARY OF THE INVENTION

The invention relates to a method and apparatus for converting a pump for use in a combined flow stream containing a mixture of highly compressed gas, compressible liquid or supercritical fluid; and a relatively incompressible liquid. In particular, the invention pertains to converting a pump with a constant compressibility compensation for use in gradient elution supercritical fluid chromatography (SFC).

The problem addressed by the present invention is how to accomplish accurate composition of a flow stream and steady flow rates while avoiding variable compression compensation adjustments to a flow pump that is delivering a highly compressible fluid, such as carbon dioxide, to a supercritical fluid chromatography class of system. In the present invention, unmodified HPLC pumps can to deliver reproducible flow conditions of a pure fluid under isocratic conditions to an SFC system, despite having limited compressibility compensation ranges and no ability to dynamically compensate for compressibility changes. The pump delivers a compressible fluid against a back-pressure regulator installed just downstream of the pump's outlet, thereby holding a pressure force against the pump and delivering a steady, high pressure flow stream to a separation column. Pressures can reach upwards of approximately 600 bar in the flow stream. The result of the invention is controllable flow of a compressible fluid delivered downstream of the regulator to the mobile phase and into the SFC column without performing dynamic compression compensation or other types of compensations for leaks and ripples in flow on the pump.

In the present invention, calculating variable compressibility compensation is avoided when pumping compressible fluids in a supercritical fluid chromatography system. Normally a pump has to change the nature of how it moves to compress fluids, and once the fluid is compressed, then the pump delivers the fluid. The hardware and methods for performing precise compressibility in laboratory-scale pumps are difficult and expensive. By using a relatively inexpensive pump without precise mechanics, outlet pressure is controlled with the current invention, thereby significant reducing capital and operating laboratory costs. Pressure downstream of the back pressure regulator 12 may vary according to the dynamics of the SFC system. However, the pressure delivery out of the pump 10 is a constant delivery to the system.

A back pressure regulator is mounted just downstream of the pump in a supercritical chromatography system and controls the pump's outlet pressure above the inlet pressure, while maintenance pressure drop across the pump constant. The back pressure regulator could be mechanical, or electromechanical, or thermally controlled. Any of the types of back pressure regulators work with the preferred embodiment. The density of the fluid in the pump varies over a carefully controlled range during refill and delivery. If the inlet pressure is relatively high the fluid is less compressible.

**4**

If the temperature of the fluid is then maintained constant, sub-ambient level, the fluid is still less compressible and there is no change in the compressibility during a run. In an alternative exemplary embodiment, a separate system could pre-pressurize the fluid entering the pump to an elevated pressure.

In an alternative exemplary embodiment, a separate system could pre-pressurize the fluid entering the pump to an elevated pressure. A back pressure regulator is mounted just downstream of the pump and controls the pump's outlet pressure above the inlet pressure, while maintaining the pressure drop across the pump constant. The density of the fluid in the pump varies over a carefully controlled range during refill and delivery. If the inlet pressure is relatively high the fluid is less compressible. If the temperature of the fluid is then maintained constant, sub-ambient level, the fluid is still less compressible and there is no change in the compressibility during a run.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a better understanding of the nature of the present invention, reference is had to the following figures and detailed description, wherein like elements are accorded like reference numerals, and wherein:

FIG. 1 illustrates a schematic flow diagram of the supercritical fluid chromatography system in the prior art.

FIG. 2 illustrates a schematic diagram of the modification of the system in FIG. 1 modified by the inclusion of a pressure regulator in accordance with the principles of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EXEMPLARY EMBODIMENT

The method of operation of the present invention is particularly applicable to a supercritical fluid chromatography system (SFC) depicted in the schematic of prior art in FIG. 1. The system has a reservoir supply tank **10**, holding a liquefied compressed gas, such as carbon dioxide ($CO2$). The reservoir feeds into a high-pressure mass flow control pump **12**, which adds a compressible fluid **10** to the flow stream. The SFC system has a second reservoir tank **14**, which contains modifier solvent, such as methanol, for the purpose of producing binary mixtures of modifier dissolved in the $CO2$ fluid. The modifier **14** feeds a corresponding high-pressure mass flow control pump **16**, which adds the modifier to the combined mobile phase flow stream. The two streams combine downstream of the pumps **12,16** and enter a mixing column **18** under pressure, wherein the two streams mix more thoroughly to create a single flow stream at or near supercritical conditions. Downstream of the mixing column **18**, an injection valve **20** adds sample into the flow stream.

Samples are typically injected into the mobile phase through a fixed-loop type of injector fed by a syringe or automated sample pump. After sample injection, the flow stream enters one or more chromatography columns **22**. SFC systems may operate with either packed columns or capillary columns. The outlet of the column **22** feeds the inlet of a detection device **24** that produces the chromatogram. The outlet from a detector **24** passes through a back-pressure regulator valve **26** and from there to a suitable means for fluid recovery **28**. The back-pressure regulator **26** controls the pressure throughout the column **22** such that the fluid passing from the outlet of the column **22** to the detector **24** remains at or near a desired fluid density and pressure. The method of holding high pressure in the system insures solvation throughout the entire column structure of the column or multiple columns.

A35

5

The problem addressed by the present invention is how to accomplish reproducible flow and steady flow for a pure fluid under isocratic conditions in an SFC system while avoiding variable compression compensation adjustments to flow pump 12 that is pumping a highly compressed gas, compressible liquid or supercritical fluid. Pumps used for supercritical fluid chromatography require an extended compressibility compensation range plus a dynamically variable compressibility compensation range to deliver a controllable flow rate and fluid composition.

The method of the present invention permits unmodified HPLC pumps to deliver accurate flow compensation under isocratic conditions, despite having limited compressibility compensation ranges and no ability to dynamically compensate for compressibility changes. The method controls both the inlet and outlet pressures of the pump delivering the compressible fluid. The outlet pressure is typically controlled at pressure much higher than the inlet pressure and higher than any pressure likely encountered in the subsequent use for chromatography. If the inlet pressure is constant, the fluid inlet temperature is constant, and the pressure difference across the pump is held constant, then there is no change in compressibility of the fluid. The pump can be operated at low flow rates or high flow rates and the mass flow delivered is a function of displacement speed of the piston. This approach circumvents the main problem in making accurate flow and composition in SFC due to compressibility compensation problems.

For implementation of an exemplary embodiment of the present invention, reference is made to FIG. 2. FIG. 2 is a schematic diagram from FIG. 1 with the addition of a back-pressure regulator 30 installed downstream of the pump 12 outlet. The back-pressure regulator 30 is set such that the pump 12 delivers compressible fluid 10 against at a fixed high pressure force. The pressure rate is set higher than the pressure at any point in the downstream gradient of the SFC system to ensure a steady flow regardless of pressure drops across a component. In such a mode of operation, the pump is used as a flow source. For example, the back-pressure regulator 30 could hold the pressure against the pump 12 at a constant 600 bar. The outlet pressure to the pump is not controlled, except for a second downstream back-pressure regulator 26 after the detector 24 that is set to a lower pressure, such as 100 bar. It is important to note that the pressure immediately from the pump 12 at its outlet is not controlled, rather the pump is pumping against a fixed back-pressure regulator to deliver a steady flow to column 22. The pressure drops downstream of the back-pressure regulator to whatever rate the system permits. The mass flow from the pump is controlled even though the flow rate is unknown. However, the flow rate out of the pump can be calibrated because the pump is operating at a speed, but the flow stream from the pump is leaving at a rate less than an ideal pump rate because energy is used compressing the fluid in the pump.

The present invention avoids the need for monitoring and updating high-pressure SFC pumps 12 for variable compressibility compensation. This method directly addresses the problem with methods and pumps in the prior art of SFC: as the pressure changes on the pump outlet, new compressibility compensations must be determined and the pump adjusted. Typically, pumping compressible fluids at or near SFC pressures requires that the pump must be monitored and adjusted to change the nature of how it compresses and delivers the fluid. This type of monitoring and adjustment in the SFC process is difficult and expensive.

The present invention does not require knowledge of the compressibility constant of the fluid being delivered to the

6

chromatography system because the pump is pumping at constant pressure. The pump can run at different flowrates in an open loop with no compressibility compensation. The pump is controlled by the constant pressure and therefore flowrate may be changed independent of compressibility. If the pump is pumping at the same pressure, the flowrate and composition is controllable without the need for dynamic compressibility compensation. For example, the present invention does not require the calculation of how far to move the pumping pistons or how far to move the intake strokes. This is because the compressibility constant of a compressible fluid is always the same downstream of the back-pressure regulator 30. The system operates when the first flow stream is a "pure fluid." A "pure fluid" is one that is a single composition that follows a well-defined gas law. Examples of pure fluids used in SFC flow streams are carbon dioxide and freon. The pure fluid flow stream is also operated under isocratic conditions, keeping temperature and pressure as constant as is practicable.

An exemplary embodiment of the present invention could use a relatively inexpensive pump to deliver reproducible and controllable flow, without the close monitoring and adjustment typically required for SFC. Various types of pumps are also capable of delivering the flow, such as reciprocating, dual-piston, diaphragm and screw pumps. Because the pressure on the pump outlet is constant due to the back-pressure regulator 30, the same compressibility compensation is performed regardless of the flow. The flow may vary from the pump and the speed of the pump may change, but the pressure on the outlet of the pump remains constant. Therefore a different compressibility compensation scheme is not required when flow rate changes.

In a preferred embodiment, pressure is maintained downstream of the detector 24 by a second back-pressure regulator 26. The pressure on the downstream side of the first back-pressure regulator 30 can adjust to the system pressure as ultimately determined by the second back-pressure regulator 26 and pressure drops throughout the system. The pressure on the upstream side of the first back-pressure regulator 30 is higher than the pressure at the column 22 inlet to create a high pressure differential flowing towards the column. For example, the inlet pressure of the first regulator 30 may be set to approximately 300 bar and the pressure in the second regulator 26 may be set to approximately 100 bar. The higher pressure in the upstream regulator 30 creates a steady flow stream gradient to the column that is within variable flow rate and composition tolerances corresponding to the scale and flow rate demands of each sample run in the system. The flow stream becomes far less susceptible to compressibility compensation problems than prior art SFC methods.

Any of the types of back-pressure regulators capable of use in SFC systems work with the preferred embodiment. Back-pressure regulators 26, 30 may be either mechanically, electromechanically, or thermally controlled. However, back-pressure regulators should have low dead volumes if peak collection is an important result. Some older generation back-pressure regulators have low dead volumes as high as 5 ml. Back-pressure regulators may also be heated to prevent the formation of solid particles of the mobile phase as the fluid decompresses. These particles can cause noisy baselines and erratic flow within the system.

The supply stream compressible fluid 10 that is upstream of pump 12 should be pressurized. In an exemplary embodiment, steel or aluminum canisters 10 of CO2 can deliver pressurized flow to the inlet of the pump 12. To operate the method as close as possible to isocratic

7

conditions, the temperature of the compressible fluid **10** should also be controlled by temperature regulator **32** to the extent practicable. After a compression stroke in the pump **12**, the temperature of the fluid inside the pump rises. The compression stroke of the pump raises the temperature of the fluid by adiabatic heating. Temperature compensation **32** may be implemented on the fluid flow to the pump **12** by methods known in the prior art, such as chilling the pump heads, to control the temperature and pressure of the fluid on the outlet side of the pump **12**. If the inlet pressure to the pump **12** is constant, the fluid inlet temperature is constant **32**, and the pressure difference across the pump is held constant, then there are only minor changes in compressibility of the fluid. The result is that when the pump **10** is operated at either low or high flow rates, the mass flow delivered is a function of the displacement speed of the piston.

The lowest delivery pressure by the pump **12** against the first back-pressure regulator **30** may be much higher than the pressure of traditional SFC pumps. The higher delivery pressure also adds additional stress on piston seals which could cause premature wear and failure. The method of the present invention may also be less applicable for pressure or density programming of a pure fluid than a more traditional SFC pumping system, because both the lowest and highest pressures available may be limited. However, the method should be highly effective in the combi-chem application where the required range of total flow and a repetition of the same gradient can be accomplished using a narrower range of pressures.

An alternative exemplary embodiment utilizes a separate system that could pre-pressurize the fluid **10** entering the pump **12** to an elevated pressure. A back-pressure regulator is mounted downstream of the pump **12** in the similar position to **30** in FIG. 2, to control the pump outlet pressure above the inlet pressure while maintaining the pressure drop across the pump constant. If the inlet pressure from the fluid source **10** is relatively high, the fluid is less compressible. If the temperature of the fluid is then maintained at a constant, sub-ambient level, the fluid is less compressible and there is little change in compressibility of the fluid while the system is in full operation.

The present invention is well suited for use in chromatography systems operating in the supercritical, or near supercritical, ranges of flow stream components where it is necessary to obtain steady flow of liquid at high pressures with high degrees of accuracy of flow to a separation column or other separation device. Other applications include supercritical extraction systems or preparatory systems where separation and/or collection of sample components injected into a high-pressure flow streams occur.

Because many varying and different embodiments may be made within the scope of the inventive concept herein taught, and because many modifications may be made in the embodiments herein detailed in accordance with the descriptive requirements of the law, it is to be understood that the details herein are to be interpreted as illustrative and not in a limiting sense.

What is claimed:

1. A method for converting a pump for use in a combined flow stream containing a mixture of highly compressed gas, compressible liquid or supercritical fluid; and a relatively incompressible liquid, comprising:

controlling pressure of a first flow stream containing a highly compressed gas, compressible liquid, or supercritical fluid, by maintaining an elevated pressure rate after said outlet of said pump but prior to joining a second flow stream of a relatively incompressible liquid;

8

pumping of said first flow stream consisting of a pure fluid resulting in delivery of a controllable flow rate of said first flow stream at a constant compressibility compensation without the need for dynamically compensating said pump for compressibility changes in said first flow stream.

2. The method of claim **1**, wherein:

said maintenance of an elevated pressure rate after said outlet of said pump being accomplished by delivering said fluid first flow stream from said pump against a back pressure regulator valve installed in said first flow stream downstream of said pump and upstream to the joining of said first flow stream with said second fluid flow stream containing a relatively incompressible liquid.

3. The method of claim **2**, further comprising the step of:

determining the mass flowrate of said first flow stream after said back-pressure regulator by calibration.

4. The method of claim **1**, further comprising:

providing a fixed elevated back pressure against which said first fluid flow stream is pumped to provide a reproducible flow source to a supercritical fluid system.

5. The method of claim **1**, wherein:

said pump rate is controllable with variable flow rates when pumping against said elevated pressure in said first fluid flow stream.

6. The method of claim **1**, wherein:

said method is operated under approximate isocratic conditions.

7. A method for converting a pump for use in a combined flow stream containing a mixture of highly compressed gas, compressible liquid or supercritical fluid; and a relatively incompressible liquid, comprising:

controlling inlet pressure to a pump of a first flow stream of a highly compressed gas, compressible liquid or supercritical fluid;

controlling temperature of said first flow stream;

pumping of said first flow stream, consisting of a pure fluid, against an elevated pressure rate resulting in delivery of a controllable flow rate of said first flow stream at a constant compressibility compensation without the need for dynamically compensating said pump for compressibility changes in said first flow stream.

8. The method of claim **7**, wherein:

said pump is operated at variable flow rates when pumping against said elevated pressure in said first fluid flow stream.

9. The method of claim **7**, further comprising:

providing a fixed elevated back pressure against which said first fluid flow stream is pumped to provide a reproducible flow source to a supercritical fluid system.

10. The method of claim **7**, wherein:

said elevated pressure after said outlet of said pump is accomplished by delivering said first fluid flow stream from said pump against a back pressure regulator valve installed in said flow stream downstream of said pump and upstream from the joining of said first flow stream with said second fluid flow stream.

11. The method of claim **7**, wherein:

said method is operated under approximate isocratic conditions.

12. The method of claim **7**, further comprising the step of:

determining the flowrate of said first flow stream after said elevated pressure by calibration.

* * * * *

# United States Court of Appeals
## for the Federal Circuit

## CERTIFICATE OF SERVICE

Waters Technologies Corporation v. Aurora SFC Systems, 2015-1281

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MCCARTER & ENGLISH, LLP, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **April 8, 2015**, Counsel for Appellant has authorized me to electronically file the foregoing **Corrected Brief on Behalf of Appellant** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Steven B. Kelber
The Law Offices of Marc R. Labgold, P.C.
12007 Sunrise Valley Drive
Suite 110
Reston, VA  20191
Attorneys for Appellee

This was originally filed on April 6, 2015.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Robyn Cocho
Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   x   The brief contains  10,749  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   x    The brief has been prepared in a proportionally spaced typeface using  MS Word 2010  in a 14 point, times new roman font or

_____ The brief has been prepared in a monospaced typeface using MS Word 2002  in a ___ characters per inch_____ font.


/s/ Erik Paul Belt
ERIK PAUL BELT